Ronn D. TOROSSIAN, et al., Plaintiffs,

v.

Captain Dennis G. HAYO, et al., Defendants.

No. Civ.A. 97–2394.

United States District Court, District of Columbia.

April 7, 1999.

Jonathan E. Meyer, Wilmer, Cutler & Pickering, Washington, DC, for plaintiff.

Dara A. Corrigan, AUSA, United States Attorney's Office, Judiciary Center Building, Washington, DC, for defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the Court on defendants' motion to dismiss or, in the alternative, for summary judgment. Upon consideration of the motion, the plaintiffs' opposition, defendants' reply, and the record in this case, the Court grants the motion and enters summary judgment in favor of the defendants.

## I. FACTS

On October 16, 1995, one of the largest public demonstrations in the nation's history was held on the National Mall in Washington, D.C. Between half a million and a million demonstrators, predominantly African–American men, are estimated to have participated in the Million Man March, as it was called, in a national call for spiritual, moral, and social renewal. The organizers of the March obtained all necessary permits from the relevant government agencies, including a Public Gathering Permit from the National Park Service authorizing various activities on the Mall from October 11 to October 18, 1995. *See* NPS Permit, dated 10/12/95.

Plaintiffs, then members of the Coalition of Jewish Concerns—Amcha, also came to Washington to demonstrate over the weekend of October 16, 1995. They came, however, to protest certain views of Louis Farrakhan, the principal organizer of the Million Man March, who plaintiffs consider an anti-Semite.

On Sunday, October 15, 1995, plaintiffs arrived in Washington, and went directly to the National Mall. In addition to setup crews, demonstrators had already begun to amass on the Mall in preparation for the following day's Million Man March. There, plaintiffs protested against Farrakhan by holding eleven-by-seventeen inch paper signs with slogans including "Farrakhan is a Racist," "Farrakhan is Betraying the Dream," and "Farrakhan = [David] Duke Without the Sheet." Plaintiffs also chanted slogans such as "Farrakhan is a Racist," "Farrakhan is David Duke," and "Say 'No' to Hate." According to plaintiffs, over the course of the afternoon, they were surrounded by a crowd of people who verbally threatened and taunted them.

Plaintiffs allege in their complaint that officers of the National Park Police observed the crowd of people around the plaintiffs but took no action to calm the crowd or to protect plaintiffs. At some point, however, plaintiffs claim that they were approached by several Park Police officers, including defendant Lieutenant Hayo, who told the plaintiffs that they must leave the area or be arrested. Plaintiffs allege that they were offered no alternative site on which to protest, and they further state that the officers could easily have taken steps to maintain order without directing plaintiffs to cease their demonstration. The officers did not arrest plaintiffs, and in fact permitted them to continue demonstrating. Plaintiffs stopped demonstrating a short time later (allegedly fearing for their safety) and left the Mall.

Plaintiffs returned to the National Mall early the next morning, October 16, 1995, the day of the Million Man March. For some three and a half hours, plaintiffs demonstrated on the Mall, again chanting anti-Farrakhan slogans and holding signs with anti-Farrakhan slogans. Like the day before, plaintiffs were surrounded by a group of people who threatened and taunted them, using such statements as "We are going to get you," "Hitler should have finished you off," and "Jews control the world; you can't control our day." The crowd also allegedly ripped the plaintiffs' signs away from them, threw objects at them, and intentionally bumped into them.

Again, plaintiffs claim that Park Police officers observed the actions of the crowd and took no steps to protect plaintiffs. Then, at approximately 9:30 a.m., plaintiffs allege that defendants Hayo, Sher, and Panagiotopoulos, along with other officers, approached them. Plaintiffs allege that defendants Hayo and Sher ripped their signs from their hands, and the officers told them to leave the Mall or be arrested. Plaintiffs asked the officers "why they were violating their First Amendment rights," and the officers responded that plaintiffs were "inciting a riot." Plaintiffs claim that they were never offered an alternate site at which they could continue demonstrating, and that the Park Police could have maintained order without directing them to stop demonstrating.

Plaintiff Maoz also alleges that during this encounter defendant Sergeant Panagiotopoulos reached into Maoz's pants pockets and searched for additional paper signs.

At this point, plaintiffs agreed not to hold up any more signs and to cease chanting, but they told the officers that they wanted to remain on the Mall in silent protest. The Park Police officers apparently agreed, because they left the area without arresting the plaintiffs. Plaintiffs left a short time thereafter, allegedly fearing for their safety. They claim that, as they left the Mall, demonstrators from the Million Man March threw objects at them,

and the Park Police took no action to protect them.

Plaintiffs further allege that other individuals demonstrated on the Mall during the days preceding and including the Million Man March, and that these individuals were not told to cease demonstrating.

Two years after the Million Man March, plaintiffs filed this *Bivens* action for damages against defendants Hayo, Sher, Panagiotopoulos, and other unidentified Park Police officers, alleging that the defendants had violated their First and Fourth Amendment rights. In lieu of an answer, defendants filed this motion to dismiss or, in the alternative, for summary judgment. Upon consideration of the motion, the opposition thereto, and the record in this case, the Court grants the motion and enters summary judgment against the plaintiffs.

## II. LAW AND APPLICATION

### A. *Bivens Actions and Qualified Immunity for Public Officials*

■ In *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court recognized a cause of action by which an individual may sue a federal official for money damages as a result of an alleged violation of a constitutional right. Such a *Bivens* action, as it has become known, has been held to be available to plaintiffs claiming violations of the First and Fourth Amendments. *See, e.g., id.* (Fourth Amendment); *Haynesworth v. Miller*, 820 F.2d 1245, 1257 (D.C.Cir.1987) (and cases cited therein) (First Amendment).

■ However, recognizing that permitting damages suits against public officials can also have social costs, the Supreme Court has held that "government officials performing discretionary functions (have) qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights

they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Stated another way, "government officials performing discretionary functions are generally shielded from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Absent a showing that plaintiff's allegations constitute a violation of a "clearly established" right, the federal official is entitled to summary judgment without need for fact discovery. *See Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. Furthermore, the "right" at issue must be articulated with a reasonable degree of particularity such that the official "would understand that what he is doing violates the right." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034.

The Court finds that defendants' qualified immunity shields them from any civil liability to plaintiffs because the actions of the defendants, as alleged, did not constitute violations of "clearly established" rights under either the First or Fourth Amendments.

### B. *First Amendment Claim*

Plaintiffs claim that the defendants violated their First Amendment rights by ordering them to cease chanting and displaying signs and by failing to protect them from the hostile crowds that threatened and taunted them on both October 15th and 16th. The Court, of course, does not reach these issues directly, but focuses instead on whether these rights claimed by the plaintiffs were "clearly established" at the time of the alleged violations. The Court finds that they were not.

■ Demonstrations on National Park Service land in the National Capital Region are governed by Park Service regulations found at 36 C.F.R. § 7.96(g). Section 7.96(g)(2) provides that all dem-

onstrations must be held pursuant to a permit issued by the Park Service, subject to certain exceptions. One such exception is that demonstrations involving twenty-five or fewer individuals may be held without a permit provided that, inter alia, the demonstration will not unreasonably interfere with another demonstration. *See* 36 C.F.R. § 7.96(g)(2)(i). Thus, groups of less than twenty-five persons demonstrating without a permit may be ordered to cease demonstrating if their activity is found to "unreasonably interfere" with the activities of another group that is properly demonstrating, i.e. pursuant to a permit or otherwise in accordance with regulation. If the "counter-demonstrators" refuse to cease demonstrating, they may be arrested for violating a Park Service regulation.

█ Plaintiffs assert that they could not have been found to be unreasonably interfering with the Million Man March, because they were two demonstrators protesting against the movement of as many as one million demonstrators. This argument has been persuasively addressed by this Court in the past, in a case indistinguishable from this one. In *Sanders v. United States,* 518 F.Supp. 728 (D.D.C. 1981), the court found that the plaintiff did not have a right to express his views by intruding into an area reserved for another event then in progress. The court identified two government interests:

> The first concerns the safety, order, and inconvenience of those other citizens already participating in the preexisting event. . . .
>
> "Secondly, and more fundamentally, is the interest in guaranteeing citizens the right to participate in events or demonstration of their own choosing without being subjected to interference by other citizens. A physical intrusion into another event for the purpose of interjecting one's own convictions or beliefs is by definition an interference, regardless of

how insubstantial or insignificant it might appear."

*Id.* at 729–30. Indeed, plaintiffs' assertions are belied by their own accounts of crowds gathering to threaten and taunt them, and even to throw objects at them. There can be no doubt that plaintiffs' demonstration interfered with the activities carried on by the Million Man March pursuant to its Public Gathering Permit, and the Park Police acted well within their discretion in finding that such interference was unreasonable.

█ Plaintiffs nonetheless argue that the Park Police's decision to order them to stop demonstrating must satisfy a higher degree of justification because it is, they allege, content-based regulation of speech. This argument is wrong, and it has been soundly refuted by the Court of Appeals for the District of Columbia Circuit.

In *Kroll v. United States Capitol Police,* 847 F.2d 899 (D.C.Cir.1988), the Court of Appeals held that several Capitol Police officers were entitled to qualified immunity in another case indistinguishable from this one, in which the officers arrested an individual for refusing to take down a banner protesting the Olympics at a ceremony welcoming the Winter Olympics Torch Relay Team. The Court of Appeals held that the officers' actions could reasonably be considered necessary to the enforcement of the Capitol Police's permit system. "Otherwise, the Capitol Police would have been authorized to issue permits, but do nothing when counterdemonstrators chose to intrude into the area of the 'permitted' activity and carry on their efforts to communicate a different (or indeed possibly conflicting) message." *Id.* at 903. The Court of Appeals explicitly rejected the argument that its decision compromised the principle of content neutrality. *See id.*

This Court is in full agreement with the Court of Appeals' decision in *Kroll.* The Park Police made no judgment about the views expressed by plaintiffs, as opposed to those of the Million Man March or any other speaker that weekend. The relevant

characteristic of plaintiffs' speech was not its viewpoint, but rather the degree to which it interfered with the permitted activities of the Million Man March. In the case of plaintiffs, the Park Police reasonably determined that this interference rose to the level of "unreasonable interference" within the meaning of 36 C.F.R. § 7.96(g)(2)(i).

 Plaintiffs cite to several other cases stating, in essence, that the government cannot suppress speech because of the likely reaction of a hostile crowd. This principle is well-established; however, it is inapplicable to this case. The Park Service here did not deny plaintiffs a permit based on the message of their speech. To the contrary, defendants were merely implementing and enforcing a content-neutral permit scheme.[1] A lawful and reasonable element of that permit scheme is the protection of a permitted demonstration's interest in being free of unreasonable interference from counterdemonstrators.

Particularly in light of the controlling precedent of *Sanders* and *Kroll,* the defendants were obviously reasonable in ordering the plaintiffs to cease their counterdemonstration, and they are consequently entitled to the protections of the qualified immunity doctrine as to the plaintiffs' First Amendment claim.

## C. *Fourth Amendment Claim*

 The Court also concludes that the defendants did not violate any clearly established rights of plaintiffs when the defendants confiscated signs and when defendant Panagiotopoulos searched Mr. Maoz's pants pockets for more paper signs. The authority of officers to arrest a counterdemonstrator was upheld in *Kroll,* and the plaintiffs have not directly challenged that broad authority here. Under these circumstances, defendants were at least justified in believing that they were entitled to confiscate signs used in an unlawful demonstration and to perform a cursory search for more signs.[2] Certainly, they had no reason to believe that their actions violated some clearly established Fourth Amendment rights of the plaintiffs. Therefore, the defendants are entitled to qualified immunity on this claim as well.

## III. CONCLUSION

For the reasons set forth above the Court holds that the defendants are shielded from civil liability for the acts alleged by plaintiffs by the qualified immunity doctrine. Summary judgment without opportunity for discovery is therefore appropriate in this case, and defendants' motion is granted.

A separate order was issued March 30, 1999.

### MEMORANDUM ORDER

Plaintiffs filed a motion to amend the complaint to substitute parties for unnamed defendants on October 15, 1998.

---

1. To the extent that plaintiffs allege discriminatory enforcement of the permit scheme, the Court likewise finds no violation of a clearly established right. Although plaintiffs claim to have observed other demonstrators on the Mall expressing messages different than or inconsistent with those of the Million Man March, plaintiffs have not even alleged that these other counterdemonstrations attracted crowds or even that the Park Police were aware of their presence. While any counterdemonstration is by definition an interference with a permitted demonstration, *see Sanders,* 518 F.Supp. at 729–30, the Park Police necessarily have broad discretion in determining what rises to the level of "unreasonable interference" within the meaning of 36 C.F.R. § 7.96(g)(2)(i). They exercised that discretion reasonably in this case, and thus are entitled to qualified immunity.

2. A permissible search conducted with probable cause to arrest is not necessarily coextensive with that allowed incident to an actual arrest. *See United States v. Alexander,* 755 F.Supp. 448, 454 (D.D.C.1991). However, the search is permissible so long as it is commensurate with the reason for permitting the search, *cf. Cupp v. Murphy,* 412 U.S. 291, 295, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973)— here, to terminate an unlawful demonstration or, potentially, to gather evidence to support an arrest for unlawful demonstration.

Upon consideration of the motion and the opposition thereto, and in light of this Court's order issued March 30, 1999, plaintiffs' motion is hereby DENIED, because the allegations against the proposed new defendants are indistinguishable from the allegations ruled upon by the Court in its March 30, 1999 decision.

Plaintiffs also filed a motion for a limited lifting of the stay of discovery in this case on September 1, 1998. This motion is hereby DENIED as moot.

SO ORDERED.