Fred DODGE, Plaintiff,

v.

TRUSTEES OF the NATIONAL
GALLERY OF ART, et al.,
Defendants.

No. CIV.A. 03–1613(RCL).

United States District Court,
District of Columbia.

June 29, 2004.

Lee Boothby, Boothby & Yingst, Washington, DC, for Plaintiff or Petitioner.

Robin M. Earnest, U.S. Attorney's Office, Washington, DC, for Defendant or Respondent.

### MEMORANDUM OPINION

LAMBERTH, District Judge.

This matter comes before the Court on defendant's Motion to Dismiss or, in the alternative, for Summary Judgment. [# 4] Defendant moves to dismiss this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on grounds that the plaintiff has failed to state a claim upon which relief can be granted. Plaintiff submitted a memorandum in opposition, and the defendant subsequently filed a reply to plaintiff's opposition. Upon consideration of the parties' filings, the applicable law, the Federal Rules of Civil Procedure and the facts of this case, this Court finds that the defendant's Motion to Dismiss should be **GRANTED** with respect to Count I and the defendant's Motion for Summary Judgment should be **GRANTED** for Counts II and III.

### I. BACKGROUND

The plaintiff filed this complaint on July 30, 2003. The plaintiff contends that the defendants[1] violated the Privacy Act of 1974 as set forth in 5 U.S.C. § 552a by (1) the supplying of confidential medical records; and (2) the publishing of confidential information, particularly plaintiff's social security number. The plaintiff also contends that the individual defendants violated his First and Fifth Amendment Right to petition by retaliating against him by posting the posting of a Security Alert. (Pl.'s Mem. of P. & A. in Opp'n to Def. Mot to Dismiss at 1.)

The National Gallery employed Fred Dodge ("plaintiff") as an Electrician. (Def.'s Memo. in Supp. of Summ. J. at 2.) On or about November 26, 2001, Fred Dodge applied for leave status under the Family Medical Leave Act of 1993 (FMLA). (Pl.'s Compl. at ¶ 10). A letter from his son's physician supported use of the plaintiff's FMLA leave (Pl.'s Compl. at ¶ 10). On December 4, 2001, the defendant issued a letter through Linda Pettiford, the personnel staffing specialist, approving the plaintiff's request as of No-

---

1. Defendants are the National Gallery of Art (the "National Gallery"), Earl A. Powell ("Defendant Powell"), Darell R. Wilson ("Defendant Wilson"), Michael Giamber ("Defendant Giamber"), James Lucey ("Defendant Lucey"), Michael Prendergast ("Defendant Prendergast") (collectively referred to herein as the "Defendants"). Since there are multiple defendants in this case whose defenses will be considered independent of the National Gallery, "Defendants" refers to the National Gallery and all the individual defendants collectively.

vember 26, 2001, which would remain in effect until November 26, 2002.[2] (*Id.*)

During the week of February 4, 2002, the plaintiff became concerned about the confidentiality of his son's confidential medical certification which he submitted to the defendant with his FMLA application. (Pl.'s Compl. at ¶ 12.) Plaintiff alleges that he contacted the personnel department to reiterate that he did not want to allow anyone to review his son's medical file. (Pl.'s Compl. at ¶ 12.)[3]

On February 1, 2002, Mr. Thomas, the plaintiff's supervisor, notified the plaintiff of a mandatory overtime assignment he was scheduled to participate in on February 22, 2002. (Pl.'s Compl. at ¶ 12.) The National Gallery required the plaintiff's participation in a full scale test of the Gallery's emergency back-up power system. (Def.'s Ex. 7; Letter from Darrell Wilson to plaintiff, March 20, 2002 at 2.) The plaintiff requested use of his FMLA leave and was informed by Meredith Weis-

er, deputy personnel officer, that his FMLA status did not relieve him from mandatory overtime duties and therefore, the decision would have to be left to the discretion of his supervisor. (Pl.'s Compl. at ¶ 12.)

Contrary to Thomas's instructions and advance notice, the plaintiff refused to work [4] (Def.'s Ex. 7; Letter from Darrell Wilson to plaintiff, March 20, 2002 at 2.) On the day of the mandatory overtime assignment, the plaintiff mentioned to Thomas that the National Gallery could not make him work since he was approved for FMLA leave. For this reason, on or about February 27, 2002, Thomas requested information relating to the FMLA application as part of his review of the plaintiff's refusal to work the mandatory overtime assignment. Thomas concluded that the plaintiff's FMLA status did not excuse him from the mandatory overtime work assignment and initiated disciplinary action against the plaintiff.[5]

2. Plaintiff was entitled to use 12 work weeks of leave during this period. (Pl.'s Compl. at ¶ 10.)

3. "Ms. Weiser [National Gallery's Deputy Personnel Officer] noted that you considered the reason supporting your FMLA status confidential, and that you did not want to share the information with your supervisors. She reiterated to you that your supervisor needed the information in order to make an informed decision on your request. She also explained that it is your supervisor's responsibility to keep this type of sensitive information confidential. According to Ms. Weiser, she volunteered to participate in such a discussion between you and Mr. Thomas in order to emphasized the confidentiality requirements, if needed. Your conversation ended with you repeating your concerns about discussing your FMLA status with Mr. Thomas" (Def.'s Ex. 7; Letter from Darrell Wilson to plaintiff, March 20, 2002 at 2.)

4. The plaintiff implicates a slightly different time sequence in the procession of these

events. He implies that his supervisor had reviewed his FMLA application prior to February 22, 2002, the day of the mandatory work assignment. "Around this same time [February 22, 2002] plaintiff was called out of town due to the sudden death of his brother. Within a week of his return, plaintiff was aware that the personnel office had given his son's confidential file to the plaintiff's supervisor. This supervisor told plaintiff that he reviewed plaintiff's son's medical information." (Pl.'s Compl. at ¶ 14.)

5. Defendant Wilson explained, "Mr. Thomas asked Ms. Pettiford for information relating to your FMLA application as part of his review of your refusal to work the mandatory overtime assignment. After reviewing it, he determined that your FMLA approved leave is generally for pre-scheduled medical appointments and in some instance, may involve leave on an emergency basis. Mr. Thomas subsequently disapproved your excuse for refusing to work the mandatory overtime assignment, since you did not mention any pre-scheduled doctor's appointment or emergen-

(Def.'s Ex. 7; Letter from Darrell Wilson to plaintiff, March 20, 2002 at 2.)

The plaintiff composed a letter to object to his duty to work mandatory overtime to Darrell R. Wilson, ("Defendant Wilson") Administrator of the National Gallery. (Pl.'s Compl. at ¶¶ 15,16.) In response, Defendant Wilson informed the plaintiff that the supervisor had discretion and his decision would be respected because according to Gallery Circular No. 61 on FMLA, Section XI, "the employee's immediate supervisor will be responsible for serving as the primary and initial contact with his or her staff who is requesting FMLA leave." (Pl.'s Compl. at ¶ 16.)

On March 8, 2002, the plaintiff wrote an additional letter of complaint[6] to Earl A. Powell III, the Director of the National Gallery of Art. (Pl.'s Compl. ¶ 18.) In response to the plaintiff's letter, Defendant Wilson replied that the Gallery did not provide the plaintiff's supervisor with any other medical records concerning his son; and that the information was provided to the supervisor on a need to know basis in the supervisor's attempt to "decide whether [the plaintiff's] refusal to work a mandatory overtime assignment was proper." (Mem. of P. & A. in Supp. of Def. Mot. to Dismiss at 3.) On April 24, 2002, Michael Prendergast, Deputy Chief for Operations, Office of Protection Services for the defendant, found the plaintiff guilty of insubordination for failing to work the mandatory overtime on February 22, 2002 and suspended him for 4 work days.[7] (Pl.'s Compl. at ¶ 19.) Moreover, Defendant Wilson reassured the plaintiff that the Gallery did not provide the plaintiff's supervi-

sor with any other medical records concerning the plaintiff's son, outside that which was required for the supervisor to decide whether to refuse the plaintiff's refusal to work mandatory overtime was proper. (Def.'s Ex. 3; Letter from Darrell Wilson to Fred Dodge, March 20, 2002.)

The plaintiff also sent copies of his March 8th letter to Senators Barbara A. Mikulski and Paul Sarbanes and to Congressmen Steny A. Hoyer, Robert L. Ehrlich, Wayne Gilchrest, Benjamin L. Cardin, Constance A. Morella, Albert R. Wynn and Elijah E. Cummings. (Pl.'s Compl. ¶ 18.) In response to these letters, the National Gallery received two Senatorial inquiries from Senators Barbara Mikulski and Paul Sarbanes. (Def.'s Ex. 4, March 27, Response to Inquiry by Senator Sarbanes; Def.'s Ex. 5, May 21 Response to Inquiry by Senator Mikulski.)

The plaintiff alleges that the defendants violated his First Amendment Right by acting in retaliation to this letter. (Pl.'s Mem. of P. & A. in Opp'n. at 12.) Plaintiff alleges that a "Security Alert" had been posted around the National Gallery building with notices of the plaintiff's photograph, age, height, weight, date of birth, sex, race, complexion and Social Security number, which the plaintiff alleges was in retaliation for his protected action of bringing the attention of the members of Congress to his case. (Pl.'s Compl. ¶ 21.) The plaintiff alleges that this "security alert" violated his First and Fifth Amendment rights of Privacy under the Privacy Act of 1974. (Pl.'s Compl. ¶ 21.) The defendants explained, however, that this Security Alert was standard protocol when

cy requiring your use of FMLA." (Def.'s Ex. 7; Letter from Darrell Wilson to plaintiff, March 20, 2002 at 2.)

6. In this letter, the plaintiff stated, "Please contact the National Gallery of Art Personnel department on the behalf of our family and so many others that may have their children's

most confidential medical certification information exposed and have them adhere to the stringent confidentiality requirements we should be provided through FMLA." (Pl.'s Compl. ¶ 18.)

7. The plaintiff was suspended for May 13–14, 21 and 22. (Pl.'s Compl. ¶ 19.)

an employee is being removed.[8] More specifically in the plaintiff's case, this Security Alert was grounded in the defendant's express security concerns justifying the plaintiff's removal.[9]

On July 15, 2002 Michael Giamber ("Defendant Giamber"), Deputy Chief, Facilities Management, sent the plaintiff a nine page notice of proposed removal justified by four reasons: unauthorized taking of an I.D. badge,[10] making a false statement, concealment of misappropriated property and tampering with a gallery key ring.[11] (Def.'s Ex. 1; Notice of Proposed Remov-

8. "Moreover, based on my discussion with Chief Lucey, the Security Alert posted by the Gallery is the same one used whenever an employee is barred from non-public areas of the Gallery, pending a decision on a proposed removal." (Def.'s Ex. 7; Letter from George Ann Tobin, National Gallery's Personnel Officer, to plaintiff August 29, 2002 at 13.)

9. "Your [the plaintiff] misconduct is not only egregious by its very nature, but also in relation to your duties and responsibilities. As an Electrician at the Gallery, your work impacts on the Gallery's ability to provide functional, pleasing, and safe space for research, education, exhibition, production, storage, operations, and staff functions throughout our landmark buildings. As such, the degree of dependability and vigilance required of someone in your position is at the *highest level*. Due to your misconduct, which was intentional and repeated, I do not believe that you possess the ability to perform your duties as an Electrician effectively *without constant supervision*." (Def.'s Ex. 7; Letter from George Ann Tobin to plaintiff August 29, 2002 at 9) (emphases added).

10. With regard to the I.D. Badge, Giamber recounted in his letter to the Plaintiff, "On March 1, 2002, you went to the Identifications Office to obtain a replacement I.D. badge, as yours was malfunctioning. According to Brannock Realty, Security Specialist, he confirmed that your I.D. badge was indeed malfunctioning and proceeded to make a replacement.

In generating a new I.D. badge for you, Mr. Reilly experienced a recurring problem with the printer ribbon, which caused your portrait to develop as a black silhouette. This made the first badge unserviceable. According to Mr. Reilly, you were amused by this error and asked to see the badge. Mr. Reilly allowed you to inspect it. You then asked if you could keep it.

Mr. Reilly explained to you that he had a duty to destroy such defective badges and thus could not let you have it. He then proceeded to issue you a proper I.D. badge. To the best of his recollection, Mr. Reilly placed the defective badge on a counter along with other badges that needed to be destroyed.

A few days later, Brian Thomas, your supervisor at the time, observed you displaying this badge with a blacked out silhouette of your face. On March 5, 2002, Mr. Thomas checked with Mr. Reilly and inquired why you were issued a defective I.D. badge. Mr. Reilly explained what had occurred and concluded that you must have taken the defective badge, despite his telling you that you could not have it and that it needed to be destroyed.

When Mr. Thomas questioned you about this matter, you admitted to having the badge, but told him that Mr. Reilly had told you that you could have it." (Def.'s Ex. 1; Notice of Proposed Removal, July 15, 2002 at 2.)

11. With regard to reasons 2, 3 and 4 for removing the plaintiff, Giamber explained, "On April 15, 2002, I questioned you about a report I had received from Mr. Thomas that sometime in January 2001, you had removed the Seventh Street (WP–4) elevator key from the engineer's key ring. You replied that you had not done so and added that you were completely unaware of any information concerning unauthorized tampering with key rings. Indeed, you stated, 'I have no information about anybody removing keys from key rings.'

An administrative investigation of these allegations ensued. My review of the evidence developed leads me to conclude that your statements to me on April 15, 2002, were untrue.

According to Mr. Thomas, sometime after he started working at the Gallery in October 2000, he realized that the WP–4 elevator was a convenient way to access the basement level of the West Building where the Electrical

al, July 15, 2002 at 2.) Defendant Giamber explained that because the plaintiff had taken a defective key badge after explicitly being told that he could not have it and tampering with a Gallery key ring which he denied any knowledge of tampering with and was subsequently found in his possession, he was being removed. (Def. Mot. for Summ. J. at 3.). On August 29, 2002, the National Gallery issued a decision upholding the bases for the plaintiff's removal.[12] (Def. Ex. 6; Letter from George–Ann Tobin to Fred Dodge, August 29, 2002).

As the plaintiff was appealing his removal to the Merit Systems Protection Board (MSPB), the plaintiff and the defendant entered into a Settlement Agreement and a General Release Agreement ("Settlement Agreement") to resolve these employment matters. (Def.'s Memo. in Supp. of Summ. J. at 1.) The General Release Agreement provided that in exchange for the National Gallery's agreement to reinstate the plaintiff for the period covering August 31, 2002 to December 31, 2002, the plaintiff would agree to submit a resignation letter effective December 31, 2002. Additionally, the plaintiff agreed to waive his right to seek judicial relief based upon any issues related to his removal. (Statement of Material Facts not in Genuine Dispute at ¶¶ 20–21.) Paragraph 1 of the Settlement Agreement stipulates that,

"The Settlement Agreement and General Release (Agreement) is entered into on this date, January 30, 2003, by the National Gallery of Art, its Directors, officials, and employees ('the Gallery') and by Fred Dodge (Appellant) on behalf of himself, his executor, administrator, heirs and assigns. This Agreement resolves all matters arising from Appellant's removal from the Gallery; including his Merit Systems Protection Board (Board) appeal, DC–0752–03–0011–I–1 (Appeal) of this action; and *any and all claims of any nature* which Appellant raised or could raise in any forum in which he could appeal, complain, grieve or otherwise challenge said removal." Def. Ex. 9, Settlement Agreement at ¶ 1 (emphasis added).

In accordance with these terms, the plaintiff submitted his resignation effective December 31, 2002 and the Gallery reinstated and paid him $16,751.80. (Mem. of P. & A. in Supp. of Def. Mot. to Dismiss at 7.) On July 30, 2003, the plaintiff filed this Complaint naming five defendants in their individual and official capacities: Earl A. Powell III, Director; Darrell R. Wilson, Administrator; Michael Giamber, Deputy Chief; Michael Predergast, Deputy Chief for Operations of the Office of Protective Services. *Id.*

## II. ANALYSIS

A motion to dismiss under Rule 12(b)(6) tests not whether the plaintiff will prevail

---

Shop is located. One drawback was that in order to access the WP–4 elevator, he first needed to pick up his engineer's key ring from the security office located on Fourth Street. Mr. Thomas noted that picking up the key ring was not always the most practicable thing to do first thing in the morning. Instead, he relied on you to access the WP–4 elevator. This key was always in your possession; it was not attached to a key ring; and you did not return it to the security office each evening...According to Mr. Thomas, you told him that you had been doing this for

years and that nobody had caught on or questioned you about it."(Def.'s Ex. 1; Notice of Proposed Removal, July 15, 2002 at 2–3.)

12. Two months subsequent to the removal letter, George Ann Tobin, National Gallery's Personnel Officer explained, "I have decided to remove you from your position to promote the efficiency of the federal service and Gallery operations. Your [the plaintiff] removal will be effective on Friday, August 30, 2002." (Def.'s Ex. 7; Letter from George Ann Tobin at 9.)

on the merits, but whether the plaintiff has properly stated a claim. *See* Fed.R.Civ.P. 12(b)(6); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Federal Rules only require that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2). The purpose of the complaint is to simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (*quoting Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A complaint may be dismissed where it either asserts a legal theory that is not cognizable as a matter of law or fails to allege sufficient facts to support a cognizable claim. *SmileCare Dental Group v. Delta Dental Plan of California,Inc.,* 88 F.3d 780, 783 (9th Cir.1996); *see also Washington Bancorp. v. Said,* 812 F.Supp. 1256 (D.D.C.1993) (Lamberth, J.).

Pursuant to Federal Rules of Civil Procedure 56(c) Summary judgment is appropriate when there is no genuine issue as to any material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue exists if the evidence presented by the non-moving party is such that a reasonable jury could return a verdict in the favor of the non-moving party and a fact is material if it will affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In such instance, the moving party is entitled to summary judgment as a matter of law when the law supports the moving party's position. *See Jeffery v. Saraso-*

*ta White Sox, Inc.,* 64 F.3d 590, 594 (11th Cir.1995).

## A. Settlement Agreement

The defendants argue that the Settlement Agreement unambiguously bars review of the plaintiff's complaint. In the Settlement Agreement, the plaintiff, "agree[d] that any allegations, factual or legal, concerning *any aspect* of his removal or resignation from the Gallery's employment may not be the basis for any future judicial or administrative action, suit, complaint, or grievance of any kind by Appellant..." Def. Ex. #1; Settlement Agreement ¶ 3(g) (emphasis added). By incorporating the phrase "any aspect," the plaintiff has acquiesced to raising any employment related claims against the National Gallery or any actor of it. Pl. Mem. of P. & A. in Opp'n to Def. Mot. at 2. By waiving his right to raise suit against the National Gallery, the plaintiff has in essence agreed to waive his right to raise any related employment claims against his former supervisors as well. *Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10 Cir.1993) (raising a claim against a supervisor employed by Salt Lake County "is a claim against Salt Lake County *itself* ") (emphasis added).

When a case is settled extra-judicially through settlement agreements, this Court has applied the principles of contract law. *Sirmans v. Caldera* 138 F.Supp.2d 14, 19 (D.D.C.2001) (Lamberth, J.) (*citing Village of Kaktovik v. Watt,* 689 F.2d 222, 230 (D.C.Cir.1982)). An agreement to settle a legal dispute is essentially a contract. *Id.* "In such cases, the court uses traditional principles of contract interpretation to determine what claims the parties intended to 'foreclose...from future litigation.'" *Id. See e.g. Levinson v. U.S.,* 969 F.2d 260, 264 (7th Cir.1992). In this instance, the parties have clearly

waived their right to litigate with the intention of saving themselves the "time, expense and inevitable risk of litigation." *U.S. v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *Sirmans*, 138 F.Supp.2d at 19. Agreements such as these by their nature "embod[y] a compromise," because both the National Gallery and the plaintiff waived their right to bring future employment suits and given up something they might have won had they proceeded with the litigation. *Armour*, 402 U.S. at 682, 91 S.Ct. 1752.

■ However, this Settlement Agreement does not waive the plaintiff's right to raise a suit against the National Gallery or its employees for constitutional violations. Despite the potentially broad interpretation of the terms "any aspect," as stipulated in the Settlement Agreement, these terms only apply to potential employment claims which could be raised by the plaintiff. The Settlement Agreement makes no reference to the defendants' Security Notice or the plaintiff's Medical Records, but instead, focuses solely on the resolution of employment related issues, including the plaintiff's abuse of his access to secure areas. Since the plaintiff has not raised any Title VII issues or any other issues related to "any aspect" of his removal, this Court cannot find that the Settlement Agreement precludes the plaintiff from raising the issues in this current suit. *See Sirmans v. Caldera* 138 F.Supp.2d 14 (D.D.C.2001) (Lamberth, J.) (finding that a settlement agreement resolving promotion discrimination claims on the basis of his minority status did not preclude the plaintiff from raising a subsequent suit challenging Army's general promotion policies and practices). This Court finds that the plaintiff's present claim is not precluded by the settling of his previous employment related claim in the Settlement Agreement.

## B. National Gallery is immune from suit

■ The plaintiff alleges that the National Gallery violated his rights as protected by the Privacy Act of 1974 as set forth in 5 U.S.C. § 552a. Additionally, the plaintiff contends that the National Gallery is not an "establishment" of the government and therefore not shielded from litigation by sovereign immunity.

### 1. Sovereign Immunity

■ To determine whether a defendant organization is immune from suit, the Court must first discern whether, it is a "federal agency" within the definition set forth in the statute. *Expeditions Unlimited Aquatic Enter. v. Smithsonian Instit.*, 566 F.2d 289, 296 (D.C.Cir.1977). Congress established the National Gallery under the auspices of the Smithsonian Institution. 20 U.S.C. § 72 et seq. (2004). The National Gallery was established by a Joint Resolution of the 75th Congress, codified under 20 U.S.C. § 71 et seq. In this section, Chapter 3 establishes the "Smithsonian Institution, National Museums and Art Galleries" wherein which Congress explicitly devoted Subchapter II to the establishment of the National Gallery. In § 72(a), Congress specifically entrusts responsibility to a Board of Trustees to oversee the National Gallery.[13] Congress designated the "United States" to directly provide "such funds as may be necessary for the upkeep of the National Gallery of

---

13. "There is established in the Smithsonian Institution a bureau, which shall be directed by a board to be known as the Trustees of the National Gallery of Art, whose duty it shall be to maintain and administer the National Gallery of Art and site thereof and to execute such other functions as are vested in the board by this subchapter." Smithsonian Institution, National Museums and Art Galleries, 20 U.S.C. § 72(a) (2004).

Art and the administrative expenses and costs of operation thereof..." 20 U.S.C. § 74(a) (2004). Moreover, the D.C. Circuit has specifically found that the Smithsonian Museums qualify as government entities. *Expeditions,* 566 F.2d at 296. "Although the Smithsonian has a substantial private dimension, we conclude that the nature of its function as a national museum and center of scholarship, coupled with the substantial governmental role in funding and oversight, make the institution an 'independent establishment of the United States,' within the 'federal agency' definition." *Expeditions,* 566 F.2d at 296 (finding that for purposes of the Tort Claims Act, the Smithsonian Institution's Museum of Natural History and more generally the Smithsonian Institution has governmental immunity from libel suits). Since the National Gallery is a Smithsonian Museum it is therefore a government entity.

The plaintiff attempts to distinguish the National Gallery from the Smithsonian Museums in alleging that "it is merely a trust with self-perpetuating trustees as its governing authority and does not possess attributes of sovereignty." Pl. Mem. of P. & A. in Opp'n at 5. In other words, the plaintiff contends that the National Gallery is governed by a board of trustees, which is not appointed by Congress and is therefore not subject to the same governmental oversight. *Id.* at 3. However, the Court agrees with the defendants' contention that the composition of the Gallery's board does not negate the fact that it is part of the Smithsonian and therefore a government institution. Although the National Gallery has a "substantial private dimension, the nature of its function as a nation-

al museum and center of scholarship, coupled with the substantial governmental role in funding and oversight," qualify the institution as an "independent establishment of the United States." *Expeditions,* 566 F.2d at 296.

The National Gallery is not subject to suits to which it has not explicitly consented. Since the government has not waived sovereign immunity with regard to the Privacy Act as it applies to the National Gallery, the plaintiff's claim against the National Gallery cannot stand. Defendant's Motion to Dismiss with respect to the plaintiff's claims against the National Gallery are granted because the plaintiff has failed to state a claim upon which relief can be granted. *See Forman v. Small,* 271 F.3d 285 (D.C.Cir.2001). This Court concludes that as a government entity, the National Gallery is immune from suits it has not consented to. *Expeditions,* 566 F.2d at n. 6.

### 2. Privacy Act of 1974

■ Even if the National Gallery were not immune from suit, it is still not subject to the Privacy Act pursuant to 5 U.S.C. § 552a. The Privacy Act [14] prohibits a government agency from disclosing private employee information. The Smithsonian Museums, however, are not subjected to the limitations of the Privacy Act because they do not fall within the definition of an "agency." [15] *5 U.S.C. § 552a(a)-(e); Dong v. Smithsonian,* 125 F.3d 877 (D.C.Cir. 1997) (finding the Smithsonian Institution was not an agency subject to the Privacy Act because the Smithsonian was not gov-

---

14. "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record

pertains, unless disclosure of the record would be..."5 U.S.C. § 552a(b).

15. "the term 'agency' means agency as defined in section 552a(e) of this title." 5 U.S.C. § 552a(a)(1).

ernment controlled corporation or establishment of Executive Branch, and although Smithsonian received substantial federal funds, any public authority it exercised, including limited police powers, these functions were ancillary to its cultural and educational mission). For purposes of the Federal Tort Claims Act, the D.C. Circuit classified the Smithsonian as an "independent establishment of the United States," but the Privacy Act employs and requires narrower language. *Dong*, 125 F.3d at 880; *Expeditions* 566 F.2d 289, 296. An entity may be intertwined with the federal government without being an "authority of the Government of the United States." *Id.*

■ Moreover, in order for the plaintiff to obtain monetary relief on Privacy Act grounds, he must show that he suffered actual harm as a result of the violation. The plaintiff fails to show that he suffered actual harm as a result of the defendants' release of his Social Security number. In *Doe v. Chao*, the Supreme Court considered whether the Department of Labor's release of a plaintiff's Social Security number, which was voluntarily given to the Department of Labor by the plaintiff, constituted a violation of the Privacy Act. 540 U.S. 614, 124 S.Ct. 1204, 1207, 157 L.Ed.2d 1122 (2004). Since the plaintiff was seeking monetary damages under the Privacy Act, he was required to show that he suffered actual damages as a result of the defendant's release of his Social Security number. *Id.* The plaintiff in the instant case fails to show that he suffered any actual harm as a result of the defendant's alleged Privacy Act violations. In the absence of evidence indicating that the plaintiff suffered actual damages, the Court cannot grant monetary relief even if the National Gallery were subject to the restrictions set forth by the Privacy Act.

## C. Plaintiff's Bivens Claims against the Individual Defendants

■ Under the *Bivens* doctrine, an individual is permitted to sue a federal official for money damages if there has been a violation of a constitutional right. *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The Supreme Court has provided government officials with qualified immunity from suits for damages to "shield them from undue interference with their duties and from potentially disabling threats of liabilities." *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (*citing Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982)). Qualified immunity serves not merely as a defense but also as an immunity from the burdens of litigation. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Immunity questions must therefore be resolved "at the earliest possible stage in litigation" because if a case is erroneously permitted to go to trial and the defendant must "face [any] burdens of litigation," the value of qualified immunity is lost. *Id.*

■ This determination requires a two step analysis. First, as a threshold matter, the Court must evaluate whether the plaintiff has been deprived of an actual constitutional right. In other words, "Taken in the light most favorable to the party asserting the inquiry, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (*citing Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991)). In delineating the parameters of this constitutional right, the Court must avoid "defining the right in overly general terms" because to do otherwise would

"strip the qualified immunity defense of all meaning.'" *Freeman v. Fallin*, 254 F.Supp.2d 52, 58 (D.D.C.2003) (Urbina, J.) (*citing Butera v. District of Columbia*, 235 F.3d 637, 646 & n. 3 (D.C.Cir.2001)).

If the plaintiff's case passes muster under this initial inquiry, then the Court must examine whether this right was "clearly established" such that a reasonable officer would have been aware that his conduct was unlawful. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151; *see Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). The actions of the official should be "assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (*citing Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. at 640, 107 S.Ct. 3034. If the federal official was not on notice that his conduct would clearly be unlawful, summary judgment based on qualified immunity is appropriate. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 (*citing Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) ("qualified immunity protects 'all but the plainly incompetent or those who knowingly violated the law'")).

Although the specific action in question need not have been explicitly deemed unlawful by the courts, its unlawfulness in light of pre-existing law must have been apparent to the defendant. *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034; *Butera*, 235 F.3d at 646. Since permitting damages against government officials can entail substantial social costs, the "right" in question must be defined with a reasonable degree of particularity such that the "official would understand that what he is doing violates the right." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034. "[B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad reaching discovery." *Harlow*, 457 U.S. at 817–18, 102 S.Ct. 2727.

Absent a showing that the plaintiff's allegations constitute a violation of a "clearly established" right, the federal official is entitled to summary judgment without need for fact discovery. *Torossian v. Hayo*, 45 F.Supp.2d 63 (D.D.C.1999) (Lamberth, J.) (*citing Harlow*, 457 U.S. at 818, 102 S.Ct. 2727).

## 1. National Gallery's Security Alert

### a. Plaintiff's Social Security Number

Plaintiff alleges that the defendants violated his Fifth Amendment Right in a "Security Alert" which had been posted around the National Gallery building disclosing the plaintiff's photograph, age, height, weight, date of birth, sex, race, complexion and Social Security number.

The plaintiff's claim does not even pass muster under the threshold of the first prong of the analysis. A privacy interest in the protection of one's Social Security number does not rise to the level of a fundamental right protected under the Fifth Amendment's substantive due process clause. The courts have addressed relatively few cases questioning whether use of one's Social Security number qualifies as a fundamental right within the "zone of privacy." *See Greater Cleveland Welfare Rights Org. v. Bauer*, 462 F.Supp. 1313, 1319 (D.C.Ohio.1978) (refusing plaintiffs' assertion that the constitution was violated when defendants used the social security numbers of class members in the match program without having previously informed them of such intended use). The

Supreme Court has only guaranteed protection to privacy interests which fall within the "zone of privacy." *See Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (upholding a zoning ordinance limits on the types of groups that could occupy a single dwelling home because the Court found no legitimate privacy rights in excluding unrelated groups in living together); *cf. Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (finding a fit and custodial mother has a fundamental right to the custody, care and nurture of her children).

The Courts have recognized two privacy rights: the individual interest in avoiding disclosure of personal matters, and the interest in independence in making certain kinds of important decisions.[16] *Whalen v. Roe* 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The plaintiff's issue in this case leans more heavily towards the former category, which courts have referred to as "informational privacy." The Circuits have been split however on whether to recognize informational privacy as a constitutionally protected right.[17]

 Regardless of whether this right to informational privacy is protected by the Constitution, this right is not an absolute one. *U.S. v. Westinghouse,* 638 F.2d 570, 577 (3rd Cir.1980) ("In the cases in which a court has allowed some intrusion into the zone of privacy surrounding medical records, it has usually done so only after finding that the societal interest in disclosure outweighs the privacy interest on the specific facts of the case"). The government may use information covered by the right to privacy if it can show that its use of the information would advance a legitimate state interest and its actions are narrowly tailored to meet that legitimate interest. *Doe v. Attorney Gen. of U.S.,* 941 F.2d 780, 796 (9th Cir.1991) (*citing Thorne v. City of El Segundo,* 726 F.2d 459, 469–71 (9th Cir.1983)).

In this suit, the National Gallery did have a legitimate security interest in releasing a Security Alert. *Torossian* 45 F.Supp.2d at 67. Not only is this Security Alert standard procedure when a former employee is being removed, but is also more relevant in the plaintiff's case because he was being removed from his position due to his threat to museum security. He had an unauthorized security badge and an elevator key, which was not supposed to be in his possession. Moreover, when confronted about these items the plaintiff lied at the outset. The Security Alert was a "narrowly tailored" response to "meet the legitimate interest" of the National Gallery. Despite the recognition which courts have given to a constitutional right of privacy in other contexts concerning the most intimate phases of one's personal life, this Court is not convinced that the defendants in the instant case violated any right to privacy protected by the Constitution. *Jaffess v. HEW,* 393 F.Supp. 626, 629 (S.D.N.Y.1975) ("the present thrust of the decisional law does

16. However, these categories are not entirely distinct from one another as personal information is a "matter which the individual is ordinarily entitled to retain within the 'private enclave [so that] he may lead a private life.'" *U.S. v. Westinghouse Electric Corp.,* 638 F.2d 570, 577 (3rd Cir.1980).

17. The 6th Circuit has disavowed the notion of informational privacy as a constitutionally protected right. *See J.P. v. DeSanti,* 653 F.2d 1080, 1090 (6th Cir.1981). The majority view appears to be an acceptance of informational privacy as a constitutionally protected right. *See Greidinger v. Davis,* 988 F.2d 1344, 1354 (4th Cir.1993); *Barry v. City of New York,* 712 F.2d 1554, 1559 (2nd Cir.1983) (affirming that the "privacy of personal matters is a protected interest"); *Fadjo v. Coon,* 633 F.2d 1172, 1175–76 (5th Cir.1981); *U.S. v. Westinghouse,* 638 F.2d 570, 577 (3rd Cir.1980).

not include within its compass the [constitutional] right of an individual to prevent disclosure by one governmental agency to another of matters obtained in the course of the transmitting agency's regular functions").

Even if the plaintiff's claim qualifies as violation of a fundamental constitutional right, the Court hesitates to allow relief under the *Bivens* doctrine. This Court must accord deference to the Supreme Court's hesitation to expand the scope of the *Bivens* liability to "any new context or new category of defendants." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) (refusing to apply *Bivens* doctrine to private entities who engaged in alleged constitutional deprivations while acting under the color of federal law); *see Schweiker v. Chilicky*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) ("the Court refused to create a *Bivens* action even though it assumed a First Amendment violation and acknowledge that 'existing remedies do not provide complete relief for the plaintiff ").

The Supreme Court hesitates to encroach into an area of law which is "plainly inconsistent with Congress' authority in this field." *Chappell v. Wallace*, 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). If Congress had intended to offer a remedy for the specific constitutional violation in question, they could have drafted a statute towards this end. *Id.* The Supreme Court has noted that the "Legislature is far more competent than the Judiciary to carry out the necessary 'balancing [of] governmental efficiency and the rights of employees,' [the Court] has refused to 'decide whether or not it would be good policy to permit a federal employee to recover damages from a supervisor who has improperly disciplined him for exercising his First Amendment rights.' " *Bush v. Lucas*, 462 U.S. 367, 389, 103 S.Ct. 2404,

76 L.Ed.2d 648 (1983). This Court adheres to the same "deference [awarded by the Supreme Court to Congress] to indications that congressional inactions has not been inadvertent." *Id.* In the absence of affirmative action by Congress, this Court will not act. *Schweiker*, 487 U.S. at 423, 108 S.Ct. 2460 ("When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies"). This Court will adopt the same hesitance adhered to by the Supreme Court and reserve *Bivens* actions for money damages against federal officers for more egregious violations of constitutional rights. *Chappell v. Wallace*, 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).

The defendants have not violated any of the plaintiff's constitutionally protected privacy interests. The Security Alert including the plaintiff's Social Security number does not necessitate constitutional protection when it is outweighed by the National Gallery's security interest. *See Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003); *Roe v. Wade* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973). Moreover, the defendants cannot be expected to have been on notice that posting a Security Alert around the National Gallery premises warning against a dishonest employee would lead to a constitutional violation. The plaintiff fails to present any clearly established law towards this end. *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151; *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. This Court cannot justifiably classify a person's right to privacy based on the protection of

his Social Security number with a woman's right to procreate within the "penumbra" of fundamental rights. *See Griswold v. CT* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Since the plaintiff fails to clearly established a right that the defendant has violated, the defendants are entitled to summary judgment without need for fact discovery. *Torossian,* 45 F.Supp.2d at 63 (Lamberth, J.).

### b. Plaintiff's Retaliation Claim

The plaintiff claims that the individual defendants violated plaintiff's First Amendment rights to petition government for redress of grievance by retaliating against plaintiff. The plaintiff alleges that the defendants violated his First Amendment right by posting a Security Alert in retaliation to his letter to Senators and Congressmen bringing attention to his case. Pl.'s Mem. of P. & A. in Opp'n. at 12.

The Court recognizes that the plaintiff is protected by the First Amendment to speak freely and petition openly. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). Since there is no evidence that the defendant in any way obstructed the plaintiff's communication to the Senators and Congressman, the Court is not convinced that the defendant violated the plaintiff's constitutional right to free speech. The plaintiff did successfully "petition his government" for redress of grievances in his letters to Senators Mikulski and Sarbanes and Congressmen Hoyer, Ehrlich and Cummings.

The Court also recognizes that the plaintiff is protected by the First Amendment from retaliation. However, the Court is not convinced that, as the plaintiff alleges, the defendant's posting of the "security alert" with his social security notice

was in fact a measure of retaliation. Even if the inferences drawn from the facts are viewed in the light most favorable to the plaintiff, the Court believes that the Security Alert was part of the National Gallery's standard operating procedure when employees were being removed and was more specifically relevant in the plaintiff's case because he posed a threat to "the Gallery's ability to provide functional, pleasing, and safe space for research, education, exhibition, production, storage, operations, and staff functions." Def.'s Ex. 7; Letter from George Ann Tobin to plaintiff August 29, 2002 at 9.

In instances in which there is no evidence that the defendant prohibited its employee from "advocating any particular ideas" the Supreme Court has found no evidence of a constitutional violation as proscribed by the First Amendment. *See Smith v. Arkansas State Highway Employees,* 441 U.S. 463, 465, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979). With regard to the plaintiff's retaliation claim, the individual defendants in this case are entitled to summary judgment without need for fact discovery. *Torossian v. Hayo,* 45 F.Supp.2d 63 (D.D.C.1999) (Lamberth, J.) (*citing Harlow,* 457 U.S. at 818, 102 S.Ct. 2727).

### 2. Medical Records

The plaintiff also contends that the defendants violated his constitutional rights by releasing his son's medical records. The plaintiff claims that his son's medical records were improperly released to his supervisor in consideration of the plaintiff's FMLA status.

Although it is indisputable that medical records are entitled to constitutional privacy protection, this Court remains unconvinced that there was a constitutional violation in the instant case. The cases cited by the plaintiff refer to more generalized instances of release of private information

such as medical records in which states were enacting legislation to require the release of medical records. *Whalen,* 429 U.S. at 599–600, 97 S.Ct. 869 (ruling that states' implemented requirements of disclosures of private medical information, for the health of the community, does not automatically amount to an impermissible invasion of privacy); *Westinghouse,* 638 F.2d at 577 (classifying medical records of employees in zone of privacy and therefore entitled to protection, but even material which is subject to protection can be required to be disclosed upon a showing of proper governmental interest). The Court also refuses to rely on *Doe v. City of New York,* which presents the most similar situation, because in *Doe,* the plaintiff's medical records were being used against the plaintiff's best interests, whereas in the instant case, the plaintiff's medical records were being used to evaluate his FMLA status for his own well being. 15 F.3d at 267 (finding plaintiff possessed constitutional right to privacy regarding his condition as Human Immunodeficiency Virus (HIV) positive in his suit alleging that employer failed to hire him because he was a suspected of being infected with HIV). Even in these cases cited in support of the plaintiff's contentions, the courts have concluded that despite the privacy interest correlated with medical records, certain disclosures have been deemed appropriate. *Whalen,* 429 U.S. at 599–600, 97 S.Ct. 869; *Westinghouse,* 638 F.2d at 577. The Court finds that in voluntarily submitting his son's medical records, the plaintiff essentially waived his right to keep these records confidential from his supervisor in reviewing the plaintiff's FMLA status.

The defendants abided by the relevant Code of Federal Regulations sections in responding to the plaintiff's FMLA request. 29 C.F.R. § 825.500(g) explicitly states:

(g) Records and documents relating to medical certifications, recertifications or medical histories of employees or employees' family members, created for purposes of FMLA, shall be maintained as confidential medical records in separate files/records from the usual personnel files, and if ADA is also applicable, such records shall be maintained in conformance with ADA confidentiality requirements (see 29 CFR § 1630.14(c)(1)), except that: (1) Supervisors and managers may be informed regarding necessary restrictions on the work or duties of an employee and necessary accommodations;

The defendants did not improperly release the plaintiff's FMLA submissions, which included his son's medical records. The defendants' actions fall within these confines of 29 C.F.R. § 825.500(g). For the plaintiff's supervisor to decide whether the plaintiff could be excused from his mandatory overtime work duties due to his FMLA leave status, the supervisor had to understand and evaluate the urgency of the plaintiff's family conditions. In order to determine the urgency and nature of the plaintiff's FMLA justification, the supervisor had no choice but to examine the son's medical records since it was his son's medical condition that was excusing the plaintiff from work related obligations. The plaintiff cannot now legitimately argue that the defendant exceeded its authority in "turning over the complete medical records relating to one of the employee's family members." Pl.'s Compl. at ¶ 17. For the plaintiff to assume that the defendants could make a well warranted decision without these documents is infeasible. *Cf. Pollard v. City of Northwood,* 161 F.Supp.2d 782 (2001) (precluding summary judgment because of genuine issues of material fact as to whether city administrator's remarks to newspaper regarding former police officer's fitness for duty and use of antide-

pressant were an illegal disclosure of confidential medical records in violation of the American Disabilities Act).

In submitting his son's medical history for his FMLA claim, the plaintiff essentially waived his right to confidentiality. The plaintiff voluntarily submitted his information to his employer with the expectation that these documents would be used in the defendant's consideration of the plaintiff's employment responsibilities. It is unreasonable for the plaintiff to be now requesting otherwise.

 In order for the plaintiff to raise a viable Fifth Amendment constitutional violation grounded in a violation of a liberty interest, he would need to show that he was deprived of a reputational interest plus an additional interest. *See Paul v. Davis,* 424 U.S. 693, 695–96, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (finding plaintiff whose name and photograph appeared on flyer which was captioned "Active Shoplifters" and which was distributed by police chiefs to merchants did not have any legal guarantee of present enjoyment of reputation which was altered as the result of police chiefs' actions and thus suffered no deprivation of any "liberty" or "property" interests within due process guarantee). Since the plaintiff fails to present such a claim in the instant case, his claim is dismissed. *Id.* "Reputation alone, apart from some more tangible interests such as employment, does not implicate any 'liberty' or 'property' interests sufficient to invoke the procedural protection of the Due Process Clause." *Id.*

In the instant case, even if the plaintiff's facts are considered in the light most favorable to the plaintiff, he fails to state a cognizable claim redressable under the *Bivens* doctrine. Accordingly, the individual defendants in this case are shielded from liability because they have not violated a "clearly established" right. *Anderson v.*

*Creighton,* 483 U.S. at 640, 107 S.Ct. 3034. Absent a showing that the plaintiff's allegations constitute a violation of a "clearly established" right, the individual defendants are entitled to summary judgment without need for fact discovery. *Torossian,* 45 F.Supp.2d 63 (Lamberth, J.).

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiff has failed to state a claim upon which relief can be granted on Count I because the National Gallery is immune from suit. Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the defendant's Motion to Dismiss is hereby **GRANTED** with respect to Count I. As to Counts II and III, the plaintiff fails to present a genuine issue as to any material fact. Pursuant to 56(c) of the Federal Rules of Civil Procedure, the defendant's Motion for Summary Judgment is hereby **GRANTED** with respect to Counts II and III. A separate order accompanies this Memorandum Opinion.

### ORDER

Upon consideration of the parties' filings, the applicable law, the Federal Rules of Civil Procedure and the facts of this case and for the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that defendant's Motion to Dismiss Count I[# 4] is **GRANTED.**

It is further **ORDERED** that the defendant's Motion for Summary Judgment [# 4] with respect to Counts II and III are **GRANTED.**

All counts of the complaint are hereby **DISMISSED** with prejudice.

SO ORDERED.