Paul GUNSER, Shawn Dougherty, Albert Price, Joseph Allan, Joseph McGinty, and Anthony Kowalski, Plaintiffs

v.

CITY OF PHILADELPHIA, Philadelphia Police Department, Sylvester Johnson in his individual and official capacity, Judy Dunn, Charles Feggins, Michael Gelovich, and Maurice Lanier, Defendants

No. Civ.A. 04–3548.

United States District Court,
E.D. Pennsylvania.

Nov. 15, 2005.

Peter H. Demkovitz, Marowitz & Richman, Philadelphia, PA, for Plaintiffs.

Jeffrey M. Scott, City of Philadelphia Law Department Div. Deputy City Solicitor, Philadelphia, PA, for Defendants.

## MEMORANDUM OPINION AND ORDER

RUFE, District Judge.

Before the Court is Defendants' Motion for Summary Judgment. This is a civil rights action against the City of Philadelphia (the "City"), its police department, the Police Commissioner in his individual and official capacity, and four named members of the police department's Marine Unit. There are six plaintiffs, all of whom were Philadelphia police officers in the Marine Unit.[1] In the present motion, Defendants claim that Plaintiffs entered into a settlement agreement with the City that precludes them from bringing this lawsuit, and therefore claim that this suit should be dismissed.

## FACTUAL BACKGROUND

On May 18, 2000, a nightclub and restaurant on Pier 34 in Philadelphia collapsed into the Delaware River. While recovering victims and evidence from the river, members of the Marine Unit recov-

---

1. Two Plaintiffs, McGinty and Dougherty, did not join the Response to the Motion for Summary Judgment.

ered approximately eight empty beer kegs, which were taken back to the Marine Unit headquarters and stored for a short time in the unit showers. The kegs should have been sent to Fort Mifflin with the other evidence retrieved from the pier collapse, for investigation, identification and preservation. Allegedly, believing the kegs were debris, some of the Plaintiffs directed another officer to take the kegs to a beer distributor and redeem them for approximately $10.00 each. This money allegedly went into the Marine Unit coffee fund.

On June 8, 2000, an anonymous letter was sent to the Pennsylvania Attorney General alleging that the redemption of the kegs was "diverting of evidence." The letter further alleged that Plaintiff Dougherty had impermissibly worked as a high school basketball referee while on duty as a police officer and had painted his summer home with police department paint. Plaintiffs allege that the four named Marine Unit officer Defendants sent the letter.

An Internal Investigation Division ("IID") inquiry ensued. The IID investigation was conducted between August 18, 2000 and March 11, 2002. Another police officer in the Marine Unit (the officer who had redeemed the kegs) clandestinely recorded discussions with several of the Plaintiffs to aid the IID in their investigation. Dougherty admitted his involvement in the redemption of the beer kegs on tape, and also implicated Gunser and another officer who is not a party to the lawsuit. It also revealed that other officers had falsified the Marine Unit daily attendance records in order to cover for Dougherty's absences while refereeing basketball games during assigned police shifts. The investigation substantiated most of the allegations of misconduct against Plaintiff Dougherty. Dougherty was dismissed from the police department on February 14, 2002, after criminal charges related to these allegations were filed against him on January 15, 2002. Although he was acquitted of all criminal charges at trial in July 2002, his dismissal for conduct unbecoming a police officer was not reversed.

In the course of the investigation of Dougherty, the IID interviewed many members of the Marine Unit. In so doing, the IID discovered that other Marine Unit officers had also engaged in misconduct by falsifying records or providing misinformation either prior to or during the investigation of Dougherty. Specifically, the IID concluded:

1. McGinty falsified the Marine Unit daily attendance records to cover for Dougherty's absences while refereeing, and he acknowledged doing so to IID.

2. Gunser was involved in the redemption of the beer kegs, lied to IID about his conduct, and also lied about the reasons he and Dougherty diverted the beer kegs and did not treat them as evidence.

3. Kowalski falsified Marine Unit daily attendance records to cover Dougherty's absences while refereeing basketball games, and admitted doing so to IID investigators. IID also concluded that Kowalski lied to investigators when he stated that he had never seen the beer kegs when they were stored in the unit showers prior to redemption.

4. Allan had lied to IID investigators when he denied any knowledge of the beer kegs during interviews. He also repeatedly discussed his IID interview with the other officers, in violation of direct orders.

5. Price had knowledge of the kegs, but lied about this knowledge to IID investigators.

Accordingly, in March 2002, Allan, Gunser, Kowalski, McGinty, and Price were reassigned to different police units for lying to investigators and falsifying police reports in the Dougherty matters. Requests for formal discipline of Gunser, Price, and Kowalski were instituted in November 2002. In March 2003, Gunser resigned from the police force.

After their transfer from the Marine Unit, Plaintiffs' union, the Fraternal Order of Police ("FOP") filed a grievance on their behalf. As a resolution to the grievance, the officers all entered into settlement agreements with the City agreeing to:

> release the City, its departments, boards, agencies, officials, employees and agents from any claims they had, have, or may have against them arising out of the subject matter of the aforesaid grievance and demand for arbitration.[2]

In consideration of this waiver, Kowalski and Price were returned to the Marine Unit, disciplinary actions against them were dropped, and records of the charges were expunged. By the time the settlement agreement was executed, Allan, Gunser, and McGinty had retired, so they were paid a cash settlement. Additionally, records of disciplinary charges against them were expunged, and they were promised neutral employment references in consideration of the waiver. Dougherty's dismissal was modified to a resignation, his record regarding the dismissal was expunged, he received seniority credits and leave benefits for the period between his date of dismissal and the date of the agreement, and he was to be provided with a neutral employment reference in consideration of the waiver.

Subsequently, on July 23, 2004, the Plaintiffs filed this lawsuit, alleging: 1) the City violated Plaintiffs' first amendment rights by retaliating against them for exercising their right to free speech; 2) the City violated plaintiff Dougherty's Fourteenth Amendment rights by taking away his employment without due process and by not returning his right to employment after he was acquitted of criminal charges; and 3) the City attempted to prosecute all Plaintiffs maliciously and without probable cause.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), the Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[3] To avoid summary judgment, the non-moving party must come forth with admissible evidence establishing a genuine issue of material fact.[4] In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party[5] but need not consider unsupported assertions, speculation or conclusory allegations.[6] The Court must determine whether there are any genuine issues for

---

2. Gunser, Kowalski, Price, McGinty and Allan signed their settlement agreement approximately September 11, 2003. Dougherty signed a separate settlement agreement on May 6, 2004.

3. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

4. *Id.*

5. *EEOC v. Westinghouse Elec. Corp.*, 725 F.2d 211, 216 (3d Cir.1983).

6. *Easton v. Bristol–Myers Squibb Co.*, 289 F.Supp.2d 604, 609 (E.D.Pa.2003).

trial.[7]

## DISCUSSION

Defendants argue that the Plaintiffs entered into settlement agreements with the City which preclude them from pursuing the claims in this lawsuit, and therefore the suit should be dismissed on summary judgment. At issue here is whether the release clauses in the settlement agreements preclude Plaintiffs from suing the City for violations of their constitutional rights and for malicious prosecution. Defendants argue that Plaintiffs' claims arise out of the same subject matter as their grievances and must be dismissed. Plaintiffs Gunser, Price, Allan, and Kowalski counterargue that the terms of the release do not include the subject matter of the present litigation.

■■■ General principles of contract construction usually apply to the interpretation of settlement agreements.[8] If the intent of the parties is unambiguous, the construction is a question of law which is appropriate for summary judgment.[9] However, if the terms are ambiguous, there are questions of fact which must go to a jury.[10] The initial determination as to whether the terms are ambiguous is a question of law.[11]

Plaintiffs argue that Defendants are asking the Court to construe the release clause to mean that Plaintiffs are waiving their right to bring any claim related to their employment with the City of Philadelphia. By the Court's reading, such a construction is not necessary to find in favor of Defendants. Plaintiffs' current claims are all related to the same actions and the same speech that led to their transfers from the marine unit, and hence arise out of the subject matter of the grievance.

The case Plaintiffs rely upon in their brief, *Dodge v. Trustees of the National Gallery of Art*[12] is distinguishable from the facts of this case. In *Dodge*, the Plaintiff was suspended from work for four days for refusing to work mandatory overtime (from which he felt he should be excused while on Family Medical Leave Act ("FMLA") leave), and then terminated for various security breaches. He filed a grievance, which was settled with his employer. The settlement agreement contained a general release, stating that the agreement resolved "all matters arising from Appellant's removal from the Gallery ... *and any and all claims of any nature* which Appellant raised or could raise in any forum in which he could appeal, complain, grieve, or otherwise challenge said removal."[13]

Subsequently, Dodge filed a federal lawsuit alleging violation of his constitutional rights. Specifically, the plaintiff claimed that after he wrote a letter to the Director of his agency complaining about his employer's interpretation of his FMLA rights, and sent copies of the letter to members of Congress, his employer retaliated against him by posting a security alert in the building which included his picture, name, date of birth and social security number in violation of his rights under the Privacy Act. On the defendant's

7. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

8. *N.Y. State Elec. and Gas Corp. v. FERC*, 875 F.2d 43, 45 (3d Cir.1989).

9. *W.B. v. Matula*, 67 F.3d 484, 497 (3d Cir. 1995).

10. *Id.*

11. *Id.*

12. 326 F.Supp.2d 1 (D.D.C.2004).

13. *Dodge*, 326 F.Supp.2d at 8.

motion to dismiss the claims as precluded by the settlement agreement, the *Dodge* court concluded that the settlement agreement's release did not encompass Dodge's constitutional claims against his employer, as they were unrelated to the subject matter of the settled grievance. In that case, both Dodge's actions (his written complaints about the FMLA policy) and the resultant harm to him (the public posting of his confidential information) were different from the actions (security breaches) and harm (termination) at issue in the settled grievance. The case before this Court is very different in this respect, as the claims before the Court arise out of the very same conduct and employer response as the settled grievances.

As to Count I, alleging violation of Plaintiffs' first amendment rights to free speech,[14] it is clear that these five officers were disciplined (transferred from the Marine Unit) for the *same speech* that forms the basis of their first amendment claim here. Specifically, the subject of Plaintiffs' settled grievances were their transfers from the Marine Unit for state-

ments they made to the IID during the investigation of Dougherty's conduct, for their own conduct regarding the beer kegs, and for falsifying time records to cover Dougherty's absences while he refereed basketball games. To the extent that they were disciplined for their speech, they were disciplined because the IID found the Plaintiffs' statements regarding Dougherty's alleged misconduct during the investigation were essentially false and, therefore, the statements themselves qualified as misconduct under the department disciplinary code. Any statements regarding Plaintiffs' willingness to repeat such supportive statements at Dougherty's trial are clearly related to the statements to the investigators.[15] Furthermore, the retaliation alleged in this case is the transfer from the Marine Unit, which was squarely the subject of the underlying grievance. Accordingly, the Court finds that Plaintiffs' First Amendment claims arise out of the subject matter of the grievance, and are within the scope of the release clause in the settlement agreement.[16]

---

**14.** All Plaintiffs but Dougherty join in this claim.

**15.** Most of the officers made statements to the IID investigators in the fall of 2000. Gunser and Kowalski were interviewed by Assistant District Attorney Benjamin Segal approximately one to two weeks before Dougherty's trial in July 2002. Stip. Facts at ¶ 8.

**16.** The Court also notes that if these First Amendment claims were allowed to proceed, Plaintiffs would not be considered private citizens exercising their rights of free speech. When public employees speak on matters of personal interest, rather than public concern, a federal court is generally not the appropriate forum in which to review a personnel decision taken in response to the employee's speech or behavior. *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The Defendants have a legitimate interest in promoting the integrity of the police department, and maintaining proper disci-

pline within the department. *Id.* at 151, 103 S.Ct. 1684.

In this case, it appears that Plaintiffs were disciplined for what they said or failed to say during an investigation of another officer (Dougherty). Such speech would be a matter of personal interest, not a matter of public concern, as they did not speak about any unfairness or acts of corruption committed by their employer. *See, Id.* at 145–146, 103 S.Ct. 1684. Specifically, Defendants found that Plaintiffs made false or misleading statements during the course of the IID investigation of Dougherty. Therefore, the Court will not intrude on Defendants' personnel decisions in the name of the First Amendment. *Id.* at 146, 103 S.Ct. 1684.

Plaintiffs also allege that they were disciplined for stating that they would testify on behalf of Dougherty at trial. While the Court feels that the latter would rise to the level of constitutionally protected speech, that alleged speech occurred in June or July 2002, *after*

Count II alleges that Dougherty was deprived of his property right to employment without due process of law despite acquittal on criminal charges. This Count echoes claims set forth in Dougherty's grievance, which directly addressed the propriety of his dismissal and non-reinstatement. Dougherty's only property right to his employment is conferred by his Collective Bargaining Agreement ("CBA"), which states that he cannot be discharged or disciplined without good cause. He does not have a *fundamental* property right in his employment beyond that requirement, and the Constitution only gives him a right to an adequate procedure to determine whether there is good cause to dismiss him.[17] Therefore, as the Court finds that the Constitution affords Dougherty no rights to his former employment that are not afforded by his CBA, and Dougherty previously litigated and settled his claims regarding his rights to his former employment under the CBA, the Court concludes Dougherty's claims in Count II are within the scope of the release clause in the settlement agreement.[18]

Count III alleges that all six Plaintiffs were maliciously prosecuted by Defendants. However, of the six Plaintiffs, only Dougherty was actually prosecuted by Defendants; no criminal or civil charges were ever initiated against the other Plaintiffs. Accordingly, only Dougherty can state a claim for malicious prosecution under § 1983,[19] and Count III is dismissed as to Plaintiffs Gunser, Price, Allan, McGinty, and Kowalski as matter of law. Furthermore, even if the Court were to consider the internal disciplinary actions against Plaintiffs Gunser, Price, Allan, McGinty, and Kowalski to be "malicious prosecution," these disciplinary actions were squarely the subject matter of their grievances and their settlement negotiations, and, therefore, are precluded by the release clause in the agreement. Dougherty, however, did not specifically grieve the filing of criminal charges against him, and the settlement agreement does not address any such claims. Therefore, his malicious prosecution claim is not precluded by the settlement agreement.[20] Therefore, the Court must dismiss the claims in Count III as to all Plaintiffs except Dougherty.

When a Plaintiff is alleged to have waived civil rights or constitutional claims, the Court must engage in additional analysis before finding that such claims are

the Plaintiffs were reassigned from the Marine Unit in March 2002. Although formal disciplinary action was initiated against three of the Plaintiffs (Gunser, Kowalski, and Price) in November 2002, there is no direct or indirect evidence that this action was taken as a result of Plaintiffs' proposed or actual testimony at trial.

Therefore, the Court does not find that the federal court is the appropriate forum for addressing Plaintiffs' complaints about their transfer, and further finds that the settlement agreement Plaintiffs signed fully addressed their legal rights on this matter.

17. *Waters v. Churchill*, 511 U.S. 661, 677, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Keim v. County of Bucks*, 275 F.Supp.2d 628, 634 (E.D.Pa.2003).

18. Plaintiff signed the settlement agreement in May 2004, almost two years after being acquitted of the criminal charges.

19. It is well-settled that while an action for malicious prosecution can be maintained under § 1983, to state a viable claim, a plaintiff must establish that he was prosecuted. *Keim v. County of Bucks*, 275 F.Supp.2d at 634, (*citing., Losch v. Borough of Parkesburg*, 736 F.2d 903 (3d Cir.1984)).

20. However, as noted above, Dougherty has not joined in the response to Defendant's Motion for Summary Judgment.

precluded by the release clause in a settlement agreement. The Court must look at the totality of the circumstances surrounding execution of the agreement, and determine whether the execution of the agreement was knowing and voluntary.[21] The Court may consider: a) whether the language is clear and specific; b) whether the consideration given in exchange for the waiver exceeded the relief to which the signer was entitled by law; c) whether the signer was represented by counsel; d) whether the signer received an adequate explanation of the document; e) whether the signer had time to reflect on the waiver; and f) whether the signer understood the nature and scope of the release. The Court can also look at whether there is evidence of fraud or undue influence, or whether enforcement of the agreement would be against public interest.[22]

Given the Court's finding that Plaintiffs' claims arise out of the subject matter of their grievances, along with: a) the clear and specific language of the settlement agreement; b) the consideration they received (restoration of their former assignment or cash payment, plus expungement of their disciplinary records and neutral employment references); c) Plaintiffs' representation by their union at the settlement talks; d) a belief that the nature and scope of the waiver is very clear and would be understood by a reasonable lay person; e) a finding that all relevant events in this case occurred *before* Plaintiffs signed the settlement agreement; f) a lack of any evidence or allegation of fraud or undue influence to induce Plaintiffs to sign the agreements; and g) no evidence or allegation of harm to the public interest, the Court finds that Plaintiffs' waiver was knowing and voluntary as a matter of law and that no material disputes of fact remain as to the preclusion of claims by the settlement agreements. Accordingly, summary judgment is appropriate as to Gunser, Price, Allan, McGinty, and Kowalski's claims in Counts I and III, and as to Dougherty's claim in Count II.

Despite Dougherty's failure to respond to Defendant's Motion, it is clear that Dougherty's malicious prosecution claim is not within the scope of the settlement agreement. At this point, the case has not proceeded to discovery on the merits, and Defendant's motion only asks the Court to determine whether genuine issues of fact exist as to the scope of the settlement agreement. Therefore, Dougherty may proceed with his malicious prosecution claim.

An appropriate Order follows.

### ORDER

**AND NOW**, this 15th day of November, 2005, upon review of Defendants' Motion for Summary Judgment [Doc. # 12] and Plaintiffs' response thereto, as well as supplementary information provided by the parties, it is hereby **ORDERED** that Defendants' Motion is **GRANTED** in part and **DENIED** in part.

The claims of Plaintiffs Gunser, Price, Allan, McGinty and Kowalski are all **DISMISSED** with prejudice, as they are precluded by the terms of the settlement agreement between the parties. Judgment is entered for Defendants and against these five Plaintiffs on Counts I and III.

The claim Dougherty asserts in Count II of the Complaint is **DISMISSED** with prejudice, as precluded by the terms of his settlement agreement. Judgment is en-

---

**21.** *Keim,* 275 F.Supp.2d at 634.

**22.** *Id.*

tered for Defendants and against Plaintiffs on Count II.

Defendants' Motion for Summary Judgment on Count III is **DENIED** as to Plaintiff Dougherty only.

It is so **ORDERED**.