AUTOMOBILE CLUB OF NEW YORK, INC. Plaintiff,

v.

Gretchen **DYKSTRA**, as Commissioner of the Department of Consumer Affairs of the City of New York and the City of New York, Defendants.

No. 04 Civ. 02576(RO).

United States District Court, S.D. New York.

July 28, 2004.

Anthony Genovese, Robinson, Brog, Leinwand, Greene, Geneovese & Gluck, P.C., New York, NY, for the Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New York, New York, NY, Louise Moed, for the Defendants, of counsel.

Howard Ross, Ross, Legan, Rosenberg, Zelen & Flaks, L.L.P., New York, NY, Amicus Curiae.

## MEMORANDUM & ORDER

OWEN, District Judge.

Plaintiff Automobile Club of New York ("the Club") is a not-for-profit corporation providing twenty-four hour roadside assistance and towing of privately-owned vehi-cles in the New York metropolitan and surrounding counties through a network of affiliated contractors. The Club receives and deals with requests for towing assistance in the hundreds of thousands in any given year, and as many as 40 cars per day are towed by Club contractors into, or out of, or through New York City. The New York City agency dealing with towers is, and for years has been a limited branch of the Department of Consumer Affairs for the City of New York ("DCA") together with the New York City Police Department.

The Club moves, pending the trial herein, for a preliminary injunction continuing a certain Reciprocity Agreement that came into existence in 1987 between the DCA and counties surrounding New York City (including Nassau, Suffolk and Westchester) regarding DCA's treatment of legitimately licensed tow trucks from surrounding counties. That agreement of DCA, though necessarily informal as circumstances obviously have mandated, has continuously existed since 1987 and is specifically evidenced by various DCA and Police Department writings over the sixteen years since all the way to May 19, 2004,[1] a mere few weeks ago. A number of these writings are set forth verbatim hereafter, beginning with a DCA memorandum of then Assistant Commissioner Lempin on April 4, 1990, which reads:

> SUBJECT: RECIPROCITY AGREEMENT
>
> RE: TOW TRUCK COMPANIES
>
> ---
>
> This memorandum will serve to reinforce the towing reciprocity agreement the
>
> Department has with both the Tow Advisory Board and the different representative

---

1. Notwithstanding minor occasional dishon-oring lapses over the years.

associations, regarding who requires a towing license.

The intent of the agreement was to not penalize those companies, who for the most part, just pass through the city or occasionally tow vehicles from the city to bordering counties or states.

The above memorandum was followed by a letter of Mr. Lempin, who had become DCA's First Assistant Commissioner, dated January 13, 1993 to James A. Powers, Supervisor of Licensing, Town of Hempstead. It reads in part:

Since 1987, when the Department of Consumer Affairs assumed the licensing and regulatory authority over towing businesses, we have honored an informal licensing reciprocity policy with surrounding counties. This policy allows towing firms from Nassau, Suffolk and Westchester counties to pass through New York City without having to obtain a City license.

Next Mr. Lempin, by then the DCA Deputy Commissioner wrote a letter to Deputy Mayor for Operations Anthony E. Shaw of the City of Yonkers on November 7, 1994 which reads in part:

Since 1987 when the Department of Consumer Affairs assumed the licensing and regulatory authority over towing businesses, we have honored an informal licensing reciprocity policy with surrounding counties, towns and villages. This policy allows towing firms from Nassau, Suffolk and Westchester counties, who do not conduct business on a regular basis in the city, to pass through New York City without having to obtain a Consumer Affairs tow permit.

At some point the reciprocity agreement became embodied in the printed "Patrol Guide" issued by the Police Department of the City of New York to its officers titled "Seizure of Unlicensed Tow Trucks." The Guide for January 1, 2000 reads in part:

... [T]ow trucks from outside New York City that are passing through or merely picking up or dropping off a vehicle within New York City are not subject to this [seizure] procedure.

The above "Patrol Guide" instruction was reprinted verbatim almost two years later in the "Patrol Guide" of November 30, 2001. Next, to the Court's knowledge, as recently as May 19, 2004, with specific august support, "By direction of the Police Commissioner," the Police Department of the City of New York then issued an "Operations Order" as recently as May 19, 2004 reading:

Those limited purposes for which a DCA tow truck license is NOT required are: when such trucks are merely passing through the city, just dropping off or picking up a vehicle for delivery to a point outside the city.

This latter Police Department directive was, I observe, written in the course of growing heat over this issue, for on May 13, 2004, Frank J. Rubino, Corporation Counsel of the City of Yonkers wrote:

For at least the past ten years, a reciprocity agreement has existed between the City of Yonkers, the City of New York, and other municipalities within the greater New York City metropolitan area. This agreement allows tow trucks licensed by one municipality to enter the other municipalities to pick up or drop off automobiles or pass through with or without an automobile in tow.

According to our information, since March, 2004, New York City has ceased to honor the reciprocity agreement and has commenced seizing tow trucks licensed in Yonkers.

Against this backdrop, it appears that the DCA—not the police—have for two or three months prior to May, 2004 commenced to ignore the long-standing reci-

procity and begun to seize tow trucks which were legitimately licensed in surrounding counties but were within New York City limits and not licensed by the city, and whether or not in fact towing vehicles. The DCA asserts as authority for this the New York City Administrative Code, Title 20 Chap. 2, § 20–495(d) reading: " 'Towing' shall mean the driving ... of a tow truck."

When the DCA seizes a tow truck, the owner has to post a $2,000 bond with the DCA if the owner wants to get the truck back immediately. Hearings are required to take place within five days and a decision to be rendered within three days. If the owner is found to have violated the law, the fine is generally $1,000 and approximately $250 in towing and storage fees. Needless to say, this is rather a substantial penalty to a truck owner and particularly if he or she cannot raise the money to bond back the truck and must deal with appearing at the hearing in that five-day period with all the attendant expenses. The cost to out-of-state towers, especially those from far-removed states,[2] could be prohibitively larger. All of this regulation on non-New York State towers could be a substantial impact upon interstate commerce.[3] In any event, the situation is made even more troublesome in New York City by the New York City Administrative Code, quoted above, which means that one's truck is deemed to be "towing" *even if one does not have a car in tow.* Thus, merely driving a four wheel

vehicle with a tow lift on it from Westchester through the Bronx and Queens counties through New York City to Nassau county is "towing" and therefore be seizable and subject to all the various penalties above. This was conceded by the present DCA Deputy Commissioner to the Court. The exchange is illuminating.

THE COURT: [I]f you wanted to take your tow truck and go from Nassau up to Westchester and just wanted to drive through New York, you could get seized?

THE WITNESS: Well, you could get seized. What you should know is that the reason the law was written to include such a hypothetical was because what happens is if you stop somebody and the law says it is OK to pass through and stop somebody and say, hey, where is your license, all they'd have to do is say, hey, I am just passing though, I am going to my girlfriend's in New Jersey or whatever it is. And unless we followed them around, we wouldn't know whether they were telling the truth. *So the law was written to stop enforcement officers from having to try to prove that this industry wasn't lying every time you stopped them.* (emphasis supplied).

This somewhat astonishing explanation completely flies in the face of constitutional protection to have a reasonable or probable cause before property can be seized.[4]

---

2. Maintenance costs, hotel and meals and transportation, obviously can add up.

3. The author of the Amicus Curiae brief before me notes that if every local jurisdiction within which a truck might wish to operate in New York could demand licensing decals on the windshield (a) the owner of the truck would spend more of his working days submitting to duplicative inspections and (b) would have so many decals on the windshield that the driver could not see out.

4. In striking down unconstitutionally broad statutory language, the United States Supreme Court has "long recognized that the government may not 'authorize police conduct which trenches upon Fourth Amendment rights, regardless of the labels which it attaches to such conduct.' " *Kolender v. Lawson*, 461 U.S. 352, 362 n. 1, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) (Brennan, J. concurring).

The DCA Enforcement Director also addressed this distressing situation as follows:

> [P]rior to [the expansion of the definition to include a truck equipped to tow, but without a tow] if you saw a tow truck that didn't have a medallion, you would have to establish that there was a car on hook and you'd actually have to go a little further ... before you could take any action.... [I]t could take a very long time .... anywhere from 45 minutes to two and a half hours.... [Once the definition changed] it became very simple on the inspectors.

It seems to the Court that DCA's positions above raise two major troublesome constitutional questions that must be resolved: (1) what is the seizure right of a quasi police organization such as the DCA to seize and strip an owner of a possessory right in a vehicle that is not towing anything because the DCA inspector *thinks*—but need not find—that the driver is lying about just passing through the city and (2) where is the justification to save considerable time and cut a seizure down to a few minutes just because the seizure inspector may now take the position he does not believe the driver.[5]

Further, substantial questions are raised in connection with the Club's response to the DCA's commencement of seizures in April and May of this year by setting up "handing-off" spots at the New York county lines where a legitimate New York City tow truck can take a towed vehicle and then transfer further towing to a Westchester destination by a legitimate Westchester towing vehicle. A major concern with this, as the Court sees it, is the scheduling and delays involved, particularly if the towing is necessitated by the car's break down following a Broadway show with a single woman driver, placing her in a possibly lonely and unprotected wait at the New York City border in the wee hours of the night if the pick-up tow is late. Needless to say, the reverse is equally true if the car owner has gone to a church service in Bronxville and the car must be towed back by a Westchester tower to the hand-off spot to a New York City tower to get it back to the owner's service station in mid-Manhattan.

**5.** This puts into major issue the validity of the New York City Administrative Code which by definition allows an inspector to seize such a vehicle just because it has towing equipment on its back and no city medallion. A highly similar situation was the subject of criticism in *Richard's Service Station, Inc. v. Town of Huntington*, 79 Misc.2d 834, 361 N.Y.S.2d, 497 (N.Y.Sup.Ct.1974), 361 N.Y.S.2d at pp. 504–05:

> Section 54—4(A) of the [Town of Huntington] law prohibits the operation of a 'motor vehicle designed and capable to tow other motor vehicles for hire within that portion of the Town of Huntington outside any incorporated village unless a license therefor shall have first been obtained except that tow truck operators from outside the Town of Huntington may enter the Town to remove a motor vehicle from owner's property or auto body establishment as hereinafter defined without a license'.

> The section is so all-encompassing that it would place an unlicensed tow truck from outside of the Town in violation of the law if it were merely passing through the Town of Huntington with or without a motor vehicle in tow and whether on business or not. A non-licensed tow truck from outside the Town may tow a disabled vehicle only from an owner's property or from an auto body establishment. Thus, if a non-resident's motor vehicle became disabled through non-accident he could not hire the services of an unlicensed tower operating from outside of the Town to tow the car out of the Town of Huntington unless it had been first towed by a licensed tower to a body shop in the Town. Such result is unreasonable and arbitrary and improperly discriminates against towers outside of the Town (Gen. Mun.Law s 80).

The DCA alleges its conduct is all under the umbrella of *Ace Auto Body & Towing Ltd. v. City of New York,* 171 F.3d 765 (2d Cir.1999). I disagree. There the Court was focusing on local safety factors of towers competitively racing to New York City accident sites, having heard of the accident on an intercepted New York City police radio broadcast or were involved in towing vehicles in New York believed to have been stolen or abandoned, all with safety implications. *Ace* thus provides no assistance here, for the only contention of DCA in the safety area is that it inspects the *towing equipment* and not the *vehicle,* and that it checks the criminal records of proposed drivers of tow trucks, possibly preventing employment of a former car thief or DWI or rapist as a tow truck driver. The inspection DCA speaks of is not of the vehicle itself which is done under auspices of the State of New York, and not by the DCA. Tellingly, when asked how the DCA inspection related to safety, a DCA tow truck inspector who testified before me indicated that it did not.

Q. Do you have any expertise or background in inspection of tow vehicles to determine whether or not they are safe to be on the roads?

A. That was not part of the inspection process.

Accordingly, I only focus on the criminal record investigation (which investigation, I note, North Hempstead also does) and observe that a follow-up on the employment of the tow truck drivers, is a subject that should be more fully explored at the trial herein and is perhaps severable and should be state-wide.

Given such major questions as raised above, I conclude it is entirely appropriate to consider all issues, not necessarily just the foregoing, at a full trial herein in the early fall.[6] Given all the apparent issues on the record before me, I find that most of the risks posed by DCA's interruption in towing services into and out of most of New York City are to the disabled car owners and that a marked burden on interstate commerce is imposed on towers by the City Code's broad definition of "towing activity," and the dubious value of the City licensing scheme with respect to an actual impact on towing safety and financial accountability all satisfy plaintiff's requirement for showing a risk of irreparable harm and the high standard of success on the merits. Accordingly, the preliminary injunction continuing the long-standing Reciprocity Agreement until further order of the Court is granted. The Police Department is to continue to act as it has for years in the past, (see the Guides, p. 3, *supra* ) and the DCA is hereby enjoined from seizing or otherwise sanctioning legitimate towing vehicles that are owned and operated by legitimate tow companies outside of New York City which are merely picking up or dropping off a vehicle within the City or merely passing through, with or without a vehicle in tow, so long as those towers are duly authorized to conduct towing activity pursuant to the laws and regulations of their own municipalities and in accordance with the motor vehicle laws of the State of New York. This Order in no way affects the City's right to enforce the licensing scheme as it pertains to the operations of towers engaged in point-to-point tows within the five boroughs, or as it relates to tow truck operators whose principal place of business is located within the City of New York. So ordered.

---

6. Should tow trucks be treated as just another kind of truck under overarching state legislation and regulation as are 18–wheelers to farm pick-ups?