**AUTOMOBILE CLUB OF NEW YORK, INC. Plaintiff,**

v.

**Gretchen DYKSTRA, as Commissioner of the Department of Consumer Affairs of the City of New York and the City of New York, Defendants.**

No. 04 Civ. 02576(RO).

United States District Court, S.D. New York.

March 27, 2006.

Anthony S. Genovese, New York City, Michael F. Fitzgerald, Mahopac, Erach F. Screwvala Robinson Brog Leinwand Greene Genovese & Gluck P.C., New York City, for Plaintiff.

Michael A. Cardozo, Corporation Counsel of the City of New York (Gabriel Taussig, Robin Binder, Louise A. Moed, of counsel), New York City, for Defendants.

Michael Flaks, Ross, Legan, Rosenberg, Zelen & Flaks, LLP, New York City, for Amicus Curiae.

Peter B. O'Connell, New York City, for Amicus Curiae.

## OPINION & ORDER

OWEN, District Judge.

Following a hearing, this Court, in July 2004, granted a preliminary injunction maintaining a 19–year *status quo*. The opinion is reported at *Automobile Club of New York, Inc. v. Gretchen Dykstra*, 326 F.Supp.2d 568 (S.D.N.Y.2004),[1] familiarity with which is assumed as it provides the extensive background herein, and following the denial of a stay in the Court of Appeals (*see* Appendix A, unreported, annexed), the merits of plaintiff Automobile Club of New York, Inc.'s action against the City of New York and its Department of Consumer Affairs (DCA), is now before me. I held a bench trial over three days in December 2004, where it was solidly established that towing has become enormously "nationalized." In the year 2003, plaintiff Automobile Club performed 14,000 interstate tows on behalf of its members, and other clubs in the New York area performed approximately 6,000 interstate tows in 2004 that involved New York City. Thus, the number of tows to adjoining states and within New York State which cross the border between the five boroughs of New York City and surrounding New York counties north and out to Long Island east is major,[2] as are requests of plaintiff Club by its members, merely requiring a crossing in and out of New York City, not to tow, but to give a jump start because of a dead battery or to change a flat tire, as to which entrances and exits had not been a problem until the DCA started seizures shortly before this suit began.

While over the years since 1987 there had been a few rare lapses by the DCA in honoring the informal reciprocal agreement which is extensively documented in my prior opinion, *see* 326 F.Supp.2d at 569–72, the likely reason in my view that this problem had not explosively surfaced years earlier with a plethora of DCA seizures was the existence of that simple basic workable and honored oral agreement earlier well-evidenced in the correspondence over the years between senior officials of the DCA and those surrounding communities as well as stated the New York City police department's frequently published "Patrol Guide".[3] Thus, while a certain 1980's situation in New York City called "chasing" triggered *Ace Auto Body & Towing Ltd. v. City of New York*, 171 F.3d 765 (2d Cir.1999), and DARP and later ROTOW, *see infra*, and clearly called for strict control of New York City towers in its limited area, the inter-county and interstate commerce side effects created by aspects of that control were accommodated by the reciprocal agreement.

■ For starters, the federal Commerce Clause, Art. I, § 8, cl. 3 of the Constitution,[4] is unquestionably applicable to this situation, reserving to Congress the power to legislate in matters relating to inter-

---

1. The record of that proceeding is before me now by stipulation of the parties. References to the transcripts are "1/" for the preliminary injunction hearing and "2/" for the trial on the merits.

2. These include such tows as cars transported from Long Island or Westchester or Connecticut to Florida in the winter and back in the summers, and car "dealer swaps" from one state to another through New York City.

3. This came to an end in early 2004, culminating in 21 seizures by the DCA on March 31, 2004, followed by the Court's TRO on April 5, 2004.

4. "The Congress shall have Power ... To regulate commerce ... among the several states...."

state commerce. The "dormant" Commerce Clause as the law terms it is the "other-side-of-the-coin" limitation on the power of the states to enact laws imposing substantial burdens on interstate commerce. *See South–Central Timber Development Inc. v. Wunnicke,* 467 U.S. 82, 87, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984). Also required where, as here, New York City's rules and ordinances impact interstate and intrastate commerce the same way—all *non-*New York City licensed tow trucks are treated the same; that is, they can be seized if they enter the City, whether from other states or other New York State counties—before the City's restraints can survive they must be shown to apply evenhandedly to effectuate a legitimate local public interest and that their effects on interstate commerce are only incidental. *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). Phrasing in the reverse under *Pike,* New York City's Rules and legislation can *not* be sustained if "the burden imposed upon such commerce is clearly excessive in relation to the putative local benefits." *Id.*

For many years under the reciprocity agreement between the DCA and outside counties, and as straightforwardly stated in the police "patrol guide," there was little burden. Outsiders from upstate or Long Island or New Jersey or Connecticut—or wherever—essentially did no more than drive into the City on some major streets, drop a car off at a customer's city repair shop and go back out, or vice-versa, come in to some New York City garage holding some outsider's inoperable car and take it out to the customer's Westchester repair shop, or pass through from New Jersey to Long Island or Westchester on New York City major routes. Absent this permissiveness however, a New Jersey tower, wanting to tow from Newark to Mineola on Long Island, would have to go north of Yonkers on the west (opposite) side of the Hudson River to the Tappan Zee Bridge, work across Westchester to Bridgeport, Connecticut to the Long Island Sound Ferry[5] and then on Long Island go back *west* to Mineola, perhaps more than doubling the distance at substantial time and expense.

Thus, in addition, New York City's licensing scheme, if allowed full flow, would create a major burden to the flow of interstate commerce by essentially imposing either a high toll on towers if they were to pay to be licensed to use its roads and highways[6] or a duplication of towers, and expensive "handing-off" procedure between said two towers at New York City's county lines, which plaintiff did for several weeks before the Court's TRO—and which

---

5. The Bridgeport, Connecticut Ferry is not regarded by towers as a practical alternative for towers based on Long Island to avoid the City's roads going from the Island to Westchester or New Jersey—or vice versa.

6. Any outside truck could of course be licensed, after perhaps a week or two's delay, and the fee is $600 per tow truck for two year license, and twenty dollars per driver. In addition, each company owner and driver must pay seventy-five ($75.00) dollars for a fingerprint report from the New York State Division of Criminal Justice Services. Other requirements include the placement of certain identifying information on the exterior of the truck and a review of any drivers' record and criminal history (*see, infra*). The towing equipment of each truck must be inspected at a City facility which requires a company to take the truck out of service for a period of time—thereby losing revenue. (The truck itself is inspected by the State of New York for road an worthiness).

The City's high fees are seen by neighboring jurisdictions as a toll, and while it does not figure in this opinion, there is some evidence that other surrounding counties might, depending on the outcome here, endeavor to enact and enforce a similar toll/exclusion or seizure structure making the area a shamble.

the City itself considered to be "inefficient." Otherwise, every tow truck legitimately licensed elsewhere which comes upon the City's roads or highways—whether towing, or picking up or dropping off a tow, or changing a tire, or simply driving a truck without a tow, perhaps to a City repair shop or perhaps passing through the City from Long Island to Westchester—is vulnerable to immediate seizure, *see* DCA's Deputy Commissioner's testimony, 326 F.Supp.2d at 571–72, and, if unable to afford a bond to release the truck, faces the loss of use of the truck for upwards of a week, awaiting an administrative hearing plus a possible substantial fine, and even forfeiture of the truck if the owner can not muster the fine.

But it is hardly too early here to note that, in line with the underlying principle of said reciprocity "agreement" and the police "Patrol Guide",[7] the Rules of the City of New York in force for years allows outsiders' entry and exit on New York City roads without threat of seizure in circumstances covered there. This is specifically stated in City Rule § 2–371 promulgated in 1994 and still in effect concerning the removal by the owner of a damaged vehicle towed to a City garage under the *Ace*-motivated Directed Accident Response Program (DARP).[8] It takes a little spelling out, but under that program, as background, a DARP participant tow truck is empowered to remove a vehicle involved in New York City accident which cannot be safely driven under its own power to that DARP participant's garage in New York City. The Rule then specifically provides that DARP "[p]articipants must be open [virtually daily for] redemption of vehicles towed in the DARP Program," upon presentation of sufficient proof of ownership and payment of charges, and said disabled vehicle shall then be *"immediately released"*. The Rule finally expressly provides:

> "No participant shall release a vehicle to another towing company unless that towing company is licensed or otherwise exempt from the licensing provisions of subchapter 31 of chapter 2 of title 20 of the New York City Administrative Code, *or that towing company is based outside of New York City and thereby is not required to be licensed pursuant to such provisions of the New York City Administrative Code."* (emphasis supplied).

Since the place of "redemption" and "release" is the DARP participant's garage *within the City of New York,* obviously the language of the Rule above means that a towing company truck based outside New York City is entitled to lawfully enter the City, drive to the New York City DARP garage and, on completion of the formalities, is authorized to tow the car across New York City streets to an adjacent county. Not to be repetitious, but this is exactly what the police department "Patrol Guide" has stated year after year—allowing licensed tow trucks from outside the City to come in and pick up a vehicle and take it out being exempt from seizure. *See supra.* I note that when the above DARP Rule and its obvious contradiction of the City's position was called to the Court's attention in an Amicus Brief after the preliminary injunction hearing, the City, without basis, contended at p. 2 of its Responding Memorandum, that this Rule and specifically § 2–371(w) requires a "DARP-participating tower" to tow such vehicle "to locations outside of New York

---

**7.** Notwithstanding the City has contended to the Court at numerous times that the "Patrol Guide" did not state the law, *see, e.g.,* Tr. 1/179–83.

**8.** Showing this language was no accident, it is repeated verbatim in a later section entitled The Rotation Tow Program (ROTOW) § 3–371.

City" before any turnover may be made to a non-City tow truck. Neither that section (quoted above) nor any part of the Rule says any such thing either as to DARP or ROTOW. Indeed, they state the contrary.

Next, the major DCA endeavor to justify and thereby utilize its legislation to exclude all others or seize them upon trespass is based on its assertion that its criminal background investigation of applicants to drive tow trucks in New York City serves a major safety function in that "it protects consumers of being the victims of a crime at the hands of tow truck drivers." *See City Post Trial Mem.* at 10.[9] Thus, the DCA requires all driver applicants for driving in New York City to submit fingerprints which are then sent to the New York State Division of Criminal Justice Services, which reports back on whether or not the applicant has a criminal record and what that record is. According to the DCA's testimony, 70 percent of those who apply have some criminal record. This is reviewed by the DCA's legal office pursuant to a protocol focusing mainly on the seriousness of the criminal history, its age(s), and whether the applicant lied to the DCA in the application. But the bottom line is that having done its review of the 70 percent that have a criminal record background, 6/7ths of that 70 percent are given licenses. Phrased differently, only 10 percent of all applicants are rejected for criminal background reasons although 70 percent have such and 60 percent are driving.

It would have been of assistance here to have made *some* study or report showing the efficacy of these criminal record reviews, but puzzlingly it appears that the DCA has never, at any time over the years since 1994, prepared any study or report of any kind as to whether or not this criminal inquiry has had any impact on the safety of consumers from tow truck drivers (or anybody else for that matter) nor has DCA ever communicated with any other jurisdiction (such as Huntington, which does the same thing, or neighboring Yonkers) to see how they or New York is doing.[10] The testimony of DCA witness Alba Pico, a non-lawyer who has supervised this criminal conduct inquiry for the DCA since its beginning, gave the following forthright testimony, Tr. 2/237:

> THE COURT: Have you, in the course of the years, spoken with—does Huntington do a criminal record stuff? I think they do, don't they?
>
> THE WITNESS: I don't know. I would not be aware.
>
> THE COURT: Have you ever asked them?
>
> THE WITNESS: No.
>
> THE COURT: Do you know whether Yonkers has ever considered doing this? Did you ever talk to anybody out there—
>
> THE WITNESS: No.
>
> THE COURT:—as to what their experience is?
>
> THE WITNESS: No.
>
> THE COURT: You see, what I am trying to get at is, do you have any statistical backup here that because of your setup, you got less rapes and harassments and this and that per driver than any other major city in

9. At Tr. 1/36, the City's counsel asserted the criminal background investigation as "... strictly a consumer protection issue about putting your car in the custody of someone you don't know." Even defining this as a "safety" issue, it does not rise, certainly on

this record, to justify the enormous burden on commerce, interstate or intrastate.

10. Perhaps this is because there is no evidence in this record of any plague of criminal conduct in *any jurisdiction anywhere* by tow truck drivers.

New York, Albany, Buffalo, Yonkers, you name it. Do you have anything that tells you that?

THE WITNESS: No.[11]

■ Given the totality of the foregoing, I am utterly unable to conclude that the fact that the City, however well motivated, checks criminal records, considers arrests as part of the record, and of every seven drivers with a criminal record refuses a license to one, has, over the years since 1994, had any measurable impact on the safety to any car owner or anyone else in New York City as compared with anywhere else in the state,[12] certainly not sufficient to justify prohibiting an out-of-city tower licensed by the State or any other state from entering the City to deliver or pick up a car or merely driving or towing through.[13] There must be a stronger showing than that of impact on safety to justify such marked interference with interstate and intrastate commerce affecting price, route or service under the Commerce Clause preemption 49 U.S.C. § 14501(a)(1). There is no reason why New York City (as does Huntington) may not continue, if it chooses, to utilize criminal records in making licensing decisions as to drivers applying to New York City-licensed towing companies. But where the City sees this as giving it collateral rights that "threaten[ ] to clog the avenues of commerce," because it "is not genuinely responsive to safety concerns . . ." it is preempted. *City of Columbus v. Ours Garage and Wrecker Service, Inc.*, 536 U.S. 424, 442, 122 S.Ct. 2226, 153 L.Ed.2d 430 (2002). Accordingly, the City of New York may not utilize this as a basis to prohibit legitimate tow trucks from elsewhere from entering New York City to pick up a tow or deliver a tow or drive through New York City (with or without a tow) between Long Island or New Jersey or Connecticut or Upstate New York, or seize such a truck if it so endeavors. Nor, as is dealt with immediately hereafter, can there be any exclusion or restriction by "definition" as to a tow truck *without* a tow at any time. *See infra.* Whatever else, it is just another truck.

■ Turning to this latter issue, the City asserts as integral to its position the

11. Ms. Pico was asked on the trial by the City's lawyer—as to a number of these criminal records. Tr. 2/199:

Q. I ask you to turn to the 11th rap sheet, license number ending 922. What do your records show about this person's application?

A. The records show that the license was—*that the license was granted but this is after further review.* And this file, actually, I even had it on my desk. We had to ask the person for letters of reference. This person submitted a lot of letters from the reference and commendations, and *at the end the license ended up being approved.* (emphasis supplied).

Q. Why was he going to be denied?

A. Based on the protocol and the review, the arrests were recent and related to the type of license that this person was seeking.

Q. How were they related?

A. Driving while intoxicated, possession of narcotics, possession of weapons, assault, possession of stolen property, credit cards, attempted burglary and possession of gambling records.

Q. So based on your protocol, this person is being given the opportunity to show rehabilitation documents and now . . . .

A. Yes.

[The Court, given the above, queries what crosses DCA's "unsafe" line.]

12. I am told that insurance companies are becoming more active everywhere in doing their own checking to the probable benefit of this industry.

13. The hand-off at the City line between towers—not only conceded by the City to be an inefficient procedure—but as the Court sees it, puts an owner, man or woman, at risk at lonely hours of the night at the City line, and it is undisputed that any raising or lowering of a car in tow can from time to time cause it damage—so why double the risk?

revised definition of "towing" that DCA has obtained and presently stands in the New York City Administrative Code, *supra:* "Towing" shall mean … the driving of a tow truck. On the basis of this, the DCA contends it can seize a truck without a tow, without probable cause as required by the U.S. Constitution's 4th and 14th Amendments, just on the DCA enforcement officer's "unproven"[14] conclusion questioning a driver on the road that he was "lying" to him, *see* 326 F.Supp.2d at 571.[15] In this connection, I note that the New York State definition of commercial towing in the Vehicle and Traffic Law § 107-b is: "The moving or removing of disabled, illegally parked, or abandoned motor vehicles or motor vehicles involved in accidents, *by another motor vehicle,* for which there is direct or indirect compensation." (emphasis supplied). And of course, the common dictionary definition of towing is: To drag or pull[ ] a car … by means of a device.[16]

While under Vehicle Traffic Law § 1642 Subsection 15, New York City has been given the power to supersede state law in certain areas of "towing and pushing of vehicles" its power is specifically limited to enumerated areas such as insurance, licensing and regulating persons in the business, charges for and storage of disabled vehicles. New York City is not given the power to redefine "towing" as it has. Absent such authority, it has been held in the New York case *Sureway Towing, Inc. v. Martinez,* 8 A.D.3d 490, 779 N.Y.S.2d 109 (App.Div.2d 2004):

> Local governments may only exercise those powers expressly granted to them by the State Constitution or the Legislature (*see Sand Hill Assoc. v. Legislature of County of Suffolk,* 225 A.D.2d 681, 640 N.Y.S.2d 128; *New York State Pub. Empls. Fedn., AFL–CIO v. City of Albany,* 72 N.Y.2d 96, 527 N.E.2d 253, 531 N.Y.S.2d 770 (1988)). Further, Vehicle and Traffic Law § 1600 provides that the provisions of this chapter shall be applicable and uniform throughout this state and in all political subdivisions and

---

**14.** *See* DCA's Deputy Commissioner's and Enforcement Director's testimony, both quoted at 326 F.Supp.2d at 571–72, the former stating that the law relieved "enforcement officers from having to try to prove that this industry wasn't lying every time you stopped them;" and the latter how enforcement officers therefore did not have to follow any truck without a tow for perhaps up to 2½ hours to get *"proof."*

> This is in the same area as *C.A.U.T.I.O.N., Ltd. v. City of New York,* 898 F.Supp. 1065 (S.D.N.Y.1995). There, the Court stated as to plaintiffs' allegations of a "policy and practice" by the City of the "arbitrary towing of vehicles." *Id.* at 1073:
>
> > Unreasonable seizures by State actors are a subject of the Fourth Amendment, which is made applicable to the States by the Fourteenth Amendment
> >
> > The complaint alleges that the practice [of arbitrary towing] complained of exists at the instance, or at least with the knowing acquiescence, of high City officials

> Hence, the contention that the City tows vehicles for alleged parking violations when in fact there is no basis for such charges *states a claim upon which relief may be granted.* (emphasis supplied).

The policy and practice here, *see* above, is essentially acknowledged by DCA's "major City officials." It is confirmed by a ranking City police officer as a desirable policy and practice. Tr. 1/465.

**15.** I note also the inappropriateness of this given another section of the New York City Administrative Code, § 20–522.1.b.: "Any police officer or authorized officer or employee of the department, upon service upon the owner or operator of a tow truck of a notice of violation … may seize a tow truck which such police officer or authorized officer or employee *has reasonable cause to believe* is being used in connection with such a violation." (emphasis supplied).

**16.** *The Random House College Dictionary,* 1980.

municipalities therein[,] and no local authority shall enact or enforce any local law, ordinance, order, rule or regulation in conflict with the provisions of this chapter unless expressly authority herein.

The *Sureway* opinion continues that if what the "local authority" purports to do "... is not one of the enumerated subjects that may be superseded by local law (*see* Vehicle and Traffic Law § 1642), ... the State law found in Vehicle and Traffic law [§ 107–b] remains applicable here."

Consequently, as *Sureway* observed, New York State law defining towing (§ 107–b, *supra*) was not and could not be superseded by "local law" and therefore that local definition is void, and "[a] truck is just a truck," immune from seizure when Constitutional requirements are not met.

 Accordingly, given all the foregoing, this Court concludes that seizure by a City agency of any outsider tow truck in New York City is prohibited where the only ground the agency reasonably has and can assert for the seizure is that the tow truck is not licensed by the City of New York. All tow trucks lawfully operating, with or without a tow, from anywhere outside New York City, whether based within the State or elsewhere, are to be permitted the same access to and use of New York City's roads as those towers licensed by New York City. Plaintiff Automobile Club is awarded compensatory damages against the City of New York in the amount of $17,500, together with prejudgment interest from March 31, 2004, based on the total costs of double-tows (the so-called "handing-off" procedure discussed *supra*), out-of-territory service fees and overtime services necessary for plaintiff to continue to provide quality roadside assistance and towing services to its members during the period in which the City's seizures were taking place. *See* Tr. 2/14–

20, 114–16; *see DiSorbo v. Hoy*, 343 F.3d 172, 182 (2d Cir.2003); *Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 72–75 (2d Cir.1992); and *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). While there was objection by DCA to any basis for damages at all, there was no objection to the items of cost asserted as damages and their claimed bases, or to the manner by which the damages were calculated. A municipality can be held liable for compensatory damages "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983," when the official policy is "the moving force of the constitutional violation." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.

Attorneys' fees are hereby awarded to the plaintiff under 42 U.S.C. § 1988(b), which is to serve and submit a sworn statement detailing same within ten days. Should defendants take issue with any aspect thereof, they are to notify the Court within ten days thereafter, and a hearing will then be scheduled to resolve any such issues.

Plaintiff seeks to have Title 20, Chapter 2, Subchapter 31 of the New York City Administrative Code declared unlawful and invalid; and to permanently enjoin the City and DCA from enforcing it. Some of the provisions contained therein appear to be required and appropriate under *Ace*. A hearing is hereby set for Thursday, April 13, 2006 at 10 o'clock in the morning, in Courtroom 1106 of the United States Courthouse, 40 Foley Square, to determine which sections survive and which do not.

New York City Administrative Code, Title 20, Chapter 2, Subchapter 31, § 20–

495(d), defining "towing," is, however, separately declared void.

The foregoing constitutes the Court's findings of fact and conclusions of law, and is so ordered.

## APPENDIX A

United States Court of Appeals FOR THE SECOND CIRCUIT

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, at Foley Square, in the City of New York, on the 23rd day of SEPTEMBER two thousand and four,

Present:

Hon. Wilfred Feinberg,

Hon. Thomas J. Meskill,

Hon. Barrington D. Parker, Jr.,

*Circuit Judges.*

Automobile Club of New York, Inc., Plaintiff–Appellee

v.

Gretchen Dykstra, as Commissioner of the Department of Consumer Affairs of the City of New York and City of New York, Defendants–Appellants.

Defendants–Appellants move for a stay pending appeal of the district court's judgment enjoining them from seizing or sanctioning non-New York City licensed towing vehicles that are occasionally operated in New York City and authorized to provide towing services pursuant to the regulations in other counties. Upon due consideration, it is ORDERED that the motion is denied because defendants-appellants have failed to establish irreparable harm absent the stay or a likelihood of success on appeal. *See LaRouche v. Kezer*, 20 F.3d 68, 72 (2d Cir.1994).

FOR THE COURT:

Roseann B. MacKechnie, Clerk

By: Richard Alcantara, Deputy Clerk