**Automobile Club of New York, Inc. v. Dykstra**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

(Argued: March 6, 2008                    Decided: March 24, 2008)

Docket Nos. 06-1872-cv (L), 06-5243-cv (con)

_____

AUTOMOBILE CLUB OF NEW YORK, INC.,

*Plaintiff-Appellee,*

−v.−

GRETCHEN DYKSTRA, as commissioner of the Department of Consumer Affairs of the City of
New York and CITY OF NEW YORK,

*Defendants-Appellants.*

_____

Before:

MCLAUGHLIN and WESLEY, *Circuit Judges*, and COGAN, *District Judge.*[*]

Appeal from final judgments of the United States District Court for the Southern District
of New York (Owen, *J.*) permanently enjoining the City of New York from enforcing the
provisions of its tow truck licensing scheme, codified at Title 20, Chapter 2, Subchapter 31 of the
Administrative Code of the City of New York, against tow operators from outside New York
City, invalidating § 20-495(d) of the New York City Administrative Code, and awarding
Appellee $651,856 in attorneys' fees and $6,293.98 in expenses. We affirm and hold that
enforcement of the tow truck licensing scheme against operators from outside of New York City

_____

[*] The Honorable Brian M. Cogan, United States District Court for the Eastern District of New
York, sitting by designation.

1

is not genuinely responsive to safety concerns, and, as a result, is preempted by 49 U.S.C. § 14501(c)(1).

———————

MORDECAI NEWMAN, Corporation Counsel of the City of New York, New York, NY (Michael A. Cardozo, Corporation Counsel, Larry A. Sonnenshein, Louise Moed, of counsel, *on the brief*), *for Appellants*.

ERACH SCREWVALA, Robinson Brog Leinwand Greene Genovese and Gluck, P.C., New York, NY (Michael F. Fitzgerald, of counsel, *on the brief*), *for Appellee*.

PETER B. O'CONNELL, Albany, NY *for Amici Curiae* Empire State Towing & Recovery Association, Towing & Recovery Association of America, and Conference of Northeastern Towing Associations *in Support of Appellee*.

ANDREW LEIDER, New York, NY *for Amicus Curiae* Metropolitan NY Towing, Auto Body & Salvage Association *in Support of Appellee*.

———————

PER CURIAM:

Appellants Dykstra and the City of New York (collectively, the "City"), appeal from orders of the United States District Court for the Southern District of New York (Owen, *J.*) permanently enjoining the City from enforcing its tow truck licensing Scheme, codified at Title 20, Chapter 2, Subchapter 31 of the Administrative Code of the City of New York (the "Scheme"), against tow operators from outside of New York City, declaring invalid § 20-495(d) of the Administrative Code, and awarding Appellee $651,856 in attorneys' fees and $6,293.98 in expenses. We affirm, holding that the enforcement of the City's licensing Scheme against out-of-City tow truck operators is preempted by 49 U.S.C. § 14501(c)(1) and that the district court was within its discretion in its award of attorneys' fees and expenses. Because we find that the

2

City's extraterritorial application of the Scheme is preempted we need not reach the constitutional issues raised by the parties.

**BACKGROUND**

Appellee Automobile Club of New York ("AAA") is a not-for-profit corporation which provides roadside assistance and towing in the New York metropolitan area[1] through a network of affiliated contractors. *Auto. Club of N.Y., Inc. v. Dykstra* ("*Auto. Club I*"), 326 F. Supp. 2d 568, 569 (S.D.N.Y. 2004). It brought this action challenging the City's Scheme as applied to tow trucks from outside New York City.

1. *The Scheme*

Originally enacted in 1987 and amended in 1993 and 1994, the Scheme comprehensively regulates the City's towing industry. The Scheme was enacted in large part to prevent tow truck drivers from monitoring police radios and "chasing" each other to reach the scene of a car accident first. *See* Memorandum in Support from the Office of the Mayor, Martha K. Hirst, Legislative Representative to the City Council (Feb. 25, 1987); Memorandum from Jeremy Travis, Special Counsel and Assistant Director, Office of the Mayor, Office of Operations (Dec. 8, 1986).

The Scheme makes it unlawful to "engage in towing without having first obtained a license" and authorizes the seizure of any tow truck being operated without a license. N.Y.C. Admin. Code §§ 20-496, 20-522.1. The Scheme defines "towing" to include not only the towing of a vehicle, but any "driving or other operation of a tow truck, or the offering to transport a

---

[1] AAA's territory encompasses the five boroughs of New York City, Long Island and the seven counties of the lower Hudson Valley.

3

vehicle by means of a tow truck." *Id.* § 20-495(d). Thus, as a whole, the Scheme requires that all tow trucks within the City limits must be licensed by the City or risk seizure. This is true regardless of whether the truck has a vehicle in tow and regardless of whether the truck is actively soliciting business in the City or simply passing through, such as towing a car from New Jersey to Long Island.

To obtain a license, a towing business must pay fees of $600 per truck and $20 per driver, as well as an additional fee for a fingerprint report and criminal record check. *Id.* § 20-497; Rules of the City of N.Y. § 2-364. Further, applicants must furnish proof of adequate liability insurance and either a $5,000 bond or a $200 cash contribution to the Tow Truck Industry Trust Fund. N.Y.C. Admin. Code § 20-499; Rules of the City of N.Y. § 2-375. Each tow truck is obligated to comply with New York State registration and inspection requirements. To reduce some of the economic incentives to "chase," the Scheme also established the Directed Accident Response Program ("DARP"), which requires that all vehicles disabled within the City be removed by licensed towers assigned on a rotating basis and bans the solicitation of disabled vehicles by unassigned towers. *See* N.Y.C. Admin. Code § 20-518.

2.    *Enforcement of the Scheme*

Although the text of the Scheme authorized the seizure of all unlicensed tow trucks anywhere within New York City, an informal reciprocity agreement between the City and surrounding municipalities and counties minimized enforcement of the Scheme against non-City tow operators from 1987 until 2004. This agreement is evidenced by several writings. First, an April 4, 1990 memorandum authored by then-Assistant Commissioner of the Department of Consumer Affairs ("DCA") Peter Lempin served to:

4

[R]einforce the towing reciprocity agreement the Department has with both the Tow Advisory Board and the different representative associations, regarding who requires a towing license.

The intent of the agreement was not to penalize those companies, who for the most part, just pass through the city or occasionally tow vehicles from the city to bordering counties or states.

*Auto. Club I*, 326 F. Supp. 2d at 569-70.

On January 13, 1993, Lempin, now DCA's First Assistant Commissioner, wrote to the Supervisor of Licensing for the Town of Hempstead that:

Since 1987, when the Department of Consumer Affairs assumed the licensing and regulatory authority over towing businesses, we have honored an informal licensing reciprocity policy with surrounding counties. This policy allows towing firms from Nassau, Suffolk and Westchester counties to pass through New York City without having to obtain a City license.

*Id.* at 570. The following year, Lempin, by then DCA Deputy Commissioner, wrote a nearly identical letter to the Deputy Mayor for Operations of the City of Yonkers. *Id.*

By 2000, the informal reciprocity agreement had become documented in the Patrol Guide issued by the New York Police Department titled "Seizure of Unlicensed Tow Trucks." According to the NYPD, "tow trucks from outside New York City that are passing through or merely picking up or dropping off a vehicle within New York City are not subject to this [seizure] procedure." *Id.* The same or similar language was also included in the Patrol Guide dated November 30, 2001 and a May 19, 2004 NYPD Operations Order. *Id.*

Regardless of the scope of the reciprocity, enforcement increased dramatically in 2004, when only 25% of tow operators met their license renewal deadlines. Consequently, as of January 1, 2004, DCA began conducting sweeps and seized approximately 60 tow trucks, 19% of which belonged to towers outside of the City. In 2003, AAA performed approximately 14,000

5

interstate tows, while in 2004, towing clubs in the New York area performed approximately 6,000 tows to, from, or across the City limits. *Auto. Club of N.Y., Inc. v. Dykstra* ("*Auto. Club II*"), 423 F. Supp. 2d 279, 281 (S.D.N.Y. 2006). To avoid seizure of these trucks, AAA created a "handoff" system whereby vehicles were towed to the City limits and then swapped onto a licensed tow truck. *See Auto. Club I*, 326 F. Supp. 2d at 572. According to AAA, these measures were necessary because its members did not have a sufficient number of licensed trucks to perform all tows into, out of, or through New York City.

AAA filed this action on April 5, 2004, seeking a judgment enjoining the City from enforcing the Scheme. In July 2004, the district court ordered the continuation of the reciprocity policy, and preliminarily enjoined the City from enforcing the Scheme against non-City tow trucks authorized by their own municipalities and in accordance with New York state law. *Id.* at 573. Following a full trial, the district court invalidated portions of the Scheme and specifically declared its definition of "towing" void. *Auto. Club II*, 423 F. Supp. 2d at 287-88. The court found three independent bases for this decision. First, under 49 U.S.C. § 14501(c)(1), the Scheme was preempted as "a law, regulation, or other provision . . . related to a price, route, or service of any motor carrier" not saved by the provision's safety exception to preemption. *See* 49 U.S.C. § 14501(c); *Auto. Club II*, 423 F. Supp. 2d at 285. Second, the Scheme unduly burdened interstate commerce in violation of the dormant Commerce Clause by "essentially imposing . . . a high toll on towers." *Id.* at 282. Because it requires a license simply to drive a tow truck within the City limits, the Scheme would force, for example, "a New Jersey tower, wanting to tow from Newark to . . . Long Island . . . to go north of Yonkers on the west (opposite) side of the Hudson River to the Tappan Zee Bridge, work across Westchester to Bridgeport, Connecticut to the Long Island

6

Sound Ferry and then on Long Island go back west to Mineola." *Id.* (emphasis and footnote omitted). Third, the broad definition of towing authorized seizures of trucks without the probable cause required by the Fourth and Fourteenth Amendments. *Id.* at 286. Lastly, in a separate decision, the district court awarded AAA $651,856 in attorneys' fees plus $6,293.98 in expenses. *Auto. Club of N.Y., Inc. v. Dykstra*, No. 04 Civ. 02576, 2006 U.S. Dist. LEXIS 81414, at *7 (S.D.N.Y. Nov. 6, 2006).

## DISCUSSION

### I

In 1994, Congress passed the Federal Aviation Administration Authorization Act of 1994 (the "FAAA Act"), which became codified as part of the Interstate Commerce Act. In relevant part, the FAAA Act amended the Interstate Commerce Act to preempt state regulation of certain aspects of motor carriers, including tow trucks. Specifically, the Act preempts the laws of a "State [or] political subdivision of a State . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."[2] 49 U.S.C. § 14501(c)(1). As an exception to this general preemption rule, Congress provided that the Act "shall not restrict the safety regulatory authority of a State with respect to motor vehicles." *Id.* § 14501(c)(2)(A).

We have previously upheld portions of the Scheme in the face of an FAAA Act challenge, holding that the safety exception applies to provisions "reasonably related" to safety. *See Ace*

---

[2] The City argues that the Scheme is outside the scope of the FAAA Act altogether. However, in doing so, it cites to *Ace Auto Body*, a case applying the safety exception. *See Ace Auto Body & Towing, Ltd. v. City of N.Y.*, 171 F.3d 765, 771 (2d Cir. 1999). We think that the Scheme is plainly within the scope of the FAAA Act, as the mere fact that any tow truck entering New York City would be subject to seizure if unlicensed clearly relates to "route," if not "price" and "service" as well. *See* 49 U.S.C. § 14501(c)(1).

7

*Auto Body & Towing, Ltd. v. City of N.Y.*, 171 F.3d 765, 777 (2d Cir. 1999). After our decision in *Ace Auto Body*, the Supreme Court ruled that the safety exception to preemption only applies to local regulations "genuinely responsive to safety concerns." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 442 (2002). Applying the *Ours Garage* standard, this Court limited the ongoing significance of *Ace Auto Body*.[3] *See Loyal Tire & Auto Center, Inc. v. Town of Woodbury*, 445 F.3d 136, 145 (2d Cir. 2006). "Following *Ours Garage*, we no longer consider simply whether a regulation is reasonably related to safety but must determine whether, in light of the legislative body's purpose and intent, the regulation is 'genuinely responsive' to safety concerns." *Id.* Making that determination requires two steps. First, a court "must consider any specific expressions of legislative intent in the statute itself as well as the legislative history." *Id.* Then, it must assess those "purported safety justifications . . . in light of the existing record evidence." *Id.* The Scheme fails both steps.

1.      *Legislative Intent*

The record indicates that the Scheme was enacted in large part to prevent chasing. The Office of the Mayor noted that the "primary objective" of Local Law 87-28 "is to eliminate the practice, endemic to the tow industry, of monitoring police radio transmissions in order to learn of accidents and then to race to the scene to secure towing and repair work—a practice commonly known as 'chasing.'" Hirst Memorandum, *supra*. Chasing "imperils both pedestrian and vehicular safety" and "too often results in tragic injury to pedestrians and other motorists." *Id.*

---

[3] The court also called into question the continued validity of *Ace Auto Body*'s holding regarding the Scheme, stating that "Nothing in *Ace Auto Body* controls the resolution of this case . . . [and] whether or not [Woodbury's towing] law is reasonably related to safety, it is not genuinely response to safety concerns." *Loyal Tire & Auto Center, Inc. v. Town of Woodbury*, 445 F.3d 136, 148 n.6 (2d Cir. 2006).

The City Council's declaration of legislative intent concurred, noting that the "reckless conduct" inherent in chasing "can threaten life and property." Moreover, the law authorized DCA to refuse to renew, suspend or revoke a towing license where the driver operated a truck in a "grossly negligent manner," made a material false statement on an application, engaged in fraud, failed to pay a fine, was convicted of a crime having a "direct relationship to the ability to perform the licensed activities," or engaged in conduct that would "endanger the public." *Id.* The legislative history reveals that the law was also motivated by economic factors, such as encouraging industry efficiency and eliminating the predatory prices charged by chasing towers. *Id.*

In 1993, the City stiffened enforcement of the Scheme by authorizing the seizure of unlicensed tow trucks. In passing Local Law 93-10, the City Council did not discuss safety concerns, noting instead that strengthening enforcement would solve a "jurisdictional problem" posed by the number of towers failing to renew their licenses in addition to providing consumers with "timely, accurate . . . information regarding their rights." Report of the Committee on Consumer Affairs In Favor of Approving and Adopting, As Amended, a Local Law to Amend the Administrative Code of the City of New York In Relation to Increasing the Standards and Penalties for Participation in the Directed Accident Response Program and the Rotation Tow Program, New York City Local Law Bill Jacket, 1993 Local Law 10 (Dec. 17, 1992). Mayor David Dinkins stated that the bill is "designed to protect consumers by enhancing effective regulations of the tow industry." Remarks by Mayor David N. Dinkins, Public Hearing on Local Laws, New York City Local Law Bill Jacket, 1993 Local Law 10 (Jan. 22, 1993).

In 1994, the Scheme was amended again to broaden the definition of towing in N.Y.C. Admin. Code § 20-495(d) "to more clearly define what towing activity is and what vehicles will

be considered tow trucks." Memorandum in Support from Frank T. New, Office of the Mayor, Director, City Legislative Affairs (Nov. 26, 1993). "Towing" was expanded to include all tow trucks without vehicles in tow as part of an effort to "fill[] existing loopholes which . . . undermine[d] the DARP program." *Id.*

Although the record is replete with evidence that the City sought to curb a public safety risk by carefully regulating tow trucks engaged in chasing, the legislative history does nothing to explain whether the City Council intended to subject all tow trucks passing through the City to its Scheme or why such broad regulation was necessary.[4] The City may have been motivated by a desire to reduce chasing within New York City in broadening its definition of "towing," but it did not explain why increased enforcement was insufficient. Instead of enforcing existing law, the City chose to impose its Scheme on all tow trucks that happened to be within its limits, regardless of whether they were chasing. The legislative history is silent on how those trucks not engaged in chasing, or those merely driving through New York City threaten public safety and how the expanded definition of "towing" is genuinely responsive to those concerns.

2.    *Assessment of Legislative Intent*

The second step of the *Loyal Tire* framework requires an assessment of the safety justifications in light of the record evidence. *Loyal Tire*, 445 F.3d at 145. The City argues that

---

[4] In fact, one of the DARP provisions seems to suggest that non-NYC towers might be outside the scope of the Scheme. The DARP rule states that the tower assigned to retrieve the disabled vehicle may not release the vehicle to another tower unless that tower is licensed by the City or "based outside of New York City and thereby is not required to be licensed pursuant to such provisions of the New York City Administrative Code." Rules of the City of N.Y. § 2-371.

10

the regulations have helped reduce chasing, which has correspondingly improved public safety.[5]

However, the City has not presented any evidence to support this argument, relying exclusively on the Scheme's legislative history to demonstrate that the City Council and Mayor were motivated by a desire to make New York City safer. As noted by the district court, the City has never assessed the effectiveness of the Scheme in fighting chasing. Multiple amendments so soon after its enactment suggest that it was not strongly effective. In fact, the legislative history for the amendment expressly states that "[s]ince its enactment in 1987, DARP has been unable to eliminate the problem of 'chasing' that continues to plague the streets of the city of New York." Report of the Legal and Governmental Affairs Division, New York City Council Committee on Consumer Affairs (Dec. 10, 1993).

Even assuming that the Scheme has been effective in reducing chasing for accidents within New York City, the City has not articulated a reason as to why the Scheme must be enforced against all tow trucks anywhere within the City in order to reduce chasing, or how that broad enforcement is genuinely responsive to safety concerns. When a City resident's car breaks down in New Jersey, or Westchester, or Connecticut, the few trucks (if any) starting the "chase" from within the City would presumably already be licensed. Those starting and ending the chase outside of the City would not drive on City roads or highways or threaten City pedestrians. The

---

[5] The City also points to the Scheme's licensing and inspection requirements. Even though they are largely duplicative of the State's inspection requirements, the City argues that the visible City license informs consumers what they are to be charged and to whom they may complain. Although this might serve an important consumer protection purpose, it is not genuinely responsive to safety concerns. Similarly, the City argues that the Scheme's criminal background checks of drivers are responsive to safety concerns. However, the legislative history is silent on the origins of the background checks, and at trial, the City suggested that the background checks were consumer protection measures because they sought to prevent towers from charging inflated prices.

11

tow truck returning the car to the City resident's repair shop within the City would not seriously jeopardize safety within New York City either. Although enforcement of the Scheme under these circumstances might serve to protect the City resident from high prices, that is not a safety concern. At that point, it becomes precisely the general industry regulation that Congress intended to preempt in enacting 49 U.S.C. § 14501(c).

No court has upheld a licensing scheme as restrictive as New York City's. One regulation upheld was a rotation requirement and accompanying solicitation ban not unlike the City's DARP program. *See Tow Operators Working to Protect Their Right to Operate v. City of Kansas City*, 338 F.3d 873, 876 (8th Cir. 2003). On the other hand, an ordinance that, like the one at issue here, required a city license in order for a tow truck to operate on city streets has been invalidated because it did "not ensure that the towing and storage of motor vehicles will be performed safely." *See Northway Towing, Inc. v. City of Pasadena, Tex.*, 94 F. Supp. 2d 801, 803 (S.D. Tex. 2000), *abrogated on other grounds by Stucky v. City of San Antonio*, 260 F.3d 424 (5th Cir. 2001), *abrogated by City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424 (2002). The same is true of New York City's Scheme.

Enforcing the Scheme against tow trucks passing through New York City or towing vehicles into New York City does not respond to safety concerns and does not fall within the safety exception of 49 U.S.C. § 14501(c)(2)(A). Accordingly such enforcement, and the City's definition of "towing" in N.Y.C. Admin. Code § 20-495(d), are preempted by 49 U.S.C. § 14501(c)(1).

**II**

We also hold that the district court's award of attorneys' fees and expenses was not an

abuse of discretion. *See In re Holocaust Victim Assets Litig.*, 424 F.3d 150, 157 (2d Cir. 2005). The City's argument that fees should be allocated on a claim-by-claim basis has been rejected by the Supreme Court, *see Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983), and the cases cited by the City are inapposite. Finally, although a preemption claim under 49 U.S.C. § 14501(c) does not give rise to a federal right enforceable under § 1983, *see Loyal Tire*, 445 F.3d at 150, AAA's dormant Commerce Clause claim supports the district court's award of fees, *see Maher v. Gagne*, 448 U.S. 122, 132 (1980) (section 1988 fees may be awarded where "the plaintiff prevails on a wholly statutory, non-civil-rights claim pendent to a substantial constitutional claim").

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is AFFIRMED.